WIEBOLDT STORES, INC., individually and on behalf of its Official Committee of Unsecured Creditors, Plaintiff,

v.

Jerome M. SCHOTTENSTEIN, et al., Defendants.

No. 87 C 8111.

United States District Court, N.D. Illinois, E.D.

Dec. 1, 1988.

---

Sarah R. Wolff, Steven H. Cohen, M. Marshall Seeder, Sachnoff, Weaver & Rubenstein, Ltd., Chicago, Ill., for Wieboldt Stores.

Paul P. Daley, James D. St. Clair, Albert H. Notini, Hale & Door, Boston, Mass., Joseph E. Coughlin, Richard Golding, Lord, Bissell & Brook, Chicago, Ill., for Jerome Schottenstein, Schottenstein Stores Corporation, Geraldine Schottenstein, Jay L. Schottenstein, Susan Schottenstein, Ann Schottenstein, Saul Schottenstein, Ari Deshe, Jon Diamond, Irving Harris, George Kolber, Thomas Keteler.

David Bodiker, Bodiker & Holland, Columbus, Ohio, for Charles H. Schottenstein, Gary Schottenstein, Randee Schottenstein, Robert M. Schottenstein, Estate of Alvin Schottenstein.

Joel Walosky, Daniel H. Mintz, Parker, Chapin, Flattau & Klimpl, New York City, Donald E. Egan, Lee Ann Watson, Deborah A. Borrowdale, Katten, Muchin & Zavis, Chicago, Ill., for MBT Corporation, Julius Trump, Edmond Trump, James M. Jacobson, Albert Roth.

James E. O'Halloran, Clifford G. Kosoff, John F. Hennessy, Jr., O'Halloran, Lively & Walker, Northbrook, Ill., for David C. Keller and Robert A. Podesta.

Kenneth R. Gaines, Dennis P. Birke, Altheimer & Gray, Chicago, Ill., for William Darrow.

Michael Greenwald, Hess, Kaplan & McDowell, Ltd., Chicago, Ill., Phil C. Neal, Ralph T. Russell, Jr., Joel M. Hurwitz, Lawrence M. Benjamin, Neal Gerber Eisen-

berg & Lurie, Chicago, Ill., for BA Mortgage and International Realty Corp.

Jeffrey R. Liebman, Marc C. Smith, Arvey, Hodes, Costello & Burman, Chicago, Ill., for General Electric Credit Corp.

Michael A. Weininger, Barry A. Erlich, Marjorie E. Scaffner, Katz, Randall & Weinberg, Chicago, Ill., Susan Getzendanner, Allan S. Brilliant, Skadden, Arps, Slate, Meagher & Flom, Chicago, Ill., for State Street Venture, One North State Street Limited Partnership Boulevard Bank National Assoc.

Philip V. Martino, Mark A. Berkoff, Rudnick & Wolfe, Chicago, Ill., for Polk Bros., Inc. and Polk Bros. Foundation.

Mr. Jerome Reisman, Mr. Neil A. Miller, Reisman, Peirez, Reisman & Calica, Garden City, N.Y., Brian Ira Tanenbaum, James W. Corbett, Lynn & Levenstein, Ltd., Chicago, Ill., for Julian Jawitz.

Roger L. Longtin, Stephen L. Agin, Keck, Mahin & Cate, Chicago, Ill., Gerald Harris, Paul H. Aloe, Rubin, Baum, Levin, Constant & Friedman, New York City, for Saugatuck Investments Co., Inc. and Weston Associates.

Ronald L. Farkas, Ginsburg & Farkas, Chicago, Ill., for Sam Ashley and Sarah Ashley.

Floyd Babbitt, Richard H. Chapman, Fagel, Haber & Maragos, Chicago, Ill., for Norma Baurer, Sol Braverman, Arthur B. Crap, Michael Fabrikant, Howard Gottlieb, Esther Gottlieb, Harold E. Grotta, Warren Grover, Richard B. Harper, Allan Janoff, Patrick Koerber, Harry Latkin, Harry Rice, Benjamin R. Siegal, Jean D. Siegal, Gloria Spivak, Hannah R. Ziver.

Paul W. Beltz, William A. Quinlan, Paul William Beltz, P.C., Buffalo, N.Y., for Paul W. Beltz, Margaret Nichols, Robert Nichols, John J. Sullivan, Rosemary Westbrook.

Harry Wachtel, Gold & Wachtel, New York City, for Wilfred B. Cohen, Gerald Olin and Suzanne Olin.

M. William Munno, Seward & Kissel, New York City, for Robert Goldfarb.

Harley C. Guthrie, Dorothy M. Guthrie, Tampa, Fla., pro se.

Mr. John G. Cadwell, Warawsky McNeal & Associates, Chicago, Ill., for Angilos Christ Haralampus.

Peter B. Shaeffer, Chicago, Ill., for Evelyn Harmelin.

David A. Baugh, Kenneth S. Ulrich, Portes, Sharp, Herbst & Kravets, Ltd., Chicago, Ill., Mr. Edward R. Aranow, Botein, Hays & Sklar, New York City, for Abraham J. Hart, Edward J. Hart, Elinor Rogosin, and Norte & Company.

James H. Wolf, Chicago, Ill., for Victor Marek.

Robert K. Neiman, Holleb & Coff, Chicago, Ill., for Seymour Neiman.

Samuel S. Pace, Lorraine E. Pace, Crystal Lake, Ill., pro se.

David D. MacKnight, Stephen P. Mayka, Lacy, Katzen, Ryen & Mittleman, Rochester, N.Y., Michael A. Stick, Bruce W. Melton, Butler Rubin Newcomer Saltarelli & Boyd, Chicago, Ill., for Mary Caccamise, Samuel Caccamise, Sarah B. Dunkirk.

Random R. Burnett, Black, Crotty, Sims, Hubka, Burnett and Samuels, Daytona Beach, Fla., for Louis P. Samuels.

John C. DeWolfe, Jr., William J. Stevens, DeWolfe, Poynton & Stevens, Chicago, Ill., for Robert Alan Strobel.

Willaim E. Lane, Willmette, Ill., for Fred Lang.

Ms. Muriel Wageman, Chicago, Ill., pro se.

## MEMORANDUM OPINION AND ORDER

HOLDERMAN, District Judge:

Wieboldt Stores, Inc. ("Wieboldt") filed this action on September 18, 1987 under the federal bankruptcy laws, 11 U.S.C. §§ 101 *et seq.*, the state fraudulent conveyance laws, Ill.Rev.Stat. ch. 59, ¶ 4, and the Illinois Business Corporation Act, Ill.Rev.Stat. ch. 32, ¶ 1.01 *et seq.* Pending before the court are numerous motions to dismiss this action under Rules 9(b), 12(b)(2), 12(b)(6) and 19 of the Federal Rules of Civil Procedure.

## I. INTRODUCTION

Wieboldt's complaint against the defendants concerns the events and transactions surrounding a leveraged buyout ("LBO") of Wieboldt by WSI Acquisition Corporation ("WSI"). WSI, a corporation formed solely for the purpose of acquiring Wieboldt, borrowed funds from third-party lenders and delivered the proceeds to the shareholders in return for their shares. Wieboldt thereafter pledged certain of its assets to the LBO lenders to secure repayment of the loan.

The LBO reduced the assets available to Wieboldt's creditors. Wieboldt contends that, after the buyout was complete, Wieboldt's debt had increased by millions of dollars, and the proceeds made available by the LBO lenders were paid out to Wieboldt's then existing shareholders and did not accrue to the benefit of the corporation. Wieboldt's alleged insolvency after the LBO left Wieboldt with insufficient unencumbered assets to sustain its business and ensure payment to its unsecured creditors. Wieboldt therefore commenced this action on behalf of itself and its unsecured creditors, seeking to avoid the transactions constituting the LBO on the grounds that they are fraudulent under federal and state fraudulent conveyance laws.

## II. FACTS

### A. PARTIES

#### 1. *Wieboldt*

William A. Wieboldt began operating Wieboldt in Chicago as a dry goods store in 1883. Mr. Wieboldt's business prospered and diversified. In 1907 Wieboldt was incorporated under Illinois law. Wieboldt's business continued to expand. In 1982 Wieboldt's business was operated out of twelve stores and one distribution center in the Chicago metropolitan area.[1] At that time, Wieboldt employed approximately 4,000 persons and had annual sales of approximately $190 million. Its stock was publicly traded on the New York Stock Exchange.

During the 1970's, demographic changes in Wieboldt's markets, increased competition from discount operations, and poor management caused Wieboldt's business to decline. Wieboldt showed no profit after 1979 and was able to continue its operations only by periodically selling its assets to generate working capital. These assets included its store in Evanston, Illinois and some undeveloped land.

#### 2. *Defendants*

Wieboldt brings this action against 119 defendants. These defendants can be grouped into three non-exclusive categories: (1) controlling shareholders, officers and directors; (2) other shareholders of Wieboldt's common stock who owned and tendered more than 1,000 shares in response to the tender offer ("Schedule A shareholders"); and (3) entities which loaned money to fund the tender offer.

##### a. Controlling Shareholders, Officers and Directors

The individuals and entities who controlled Wieboldt in 1982 became controlling shareholders as a direct or indirect result of a 1982 takeover effort. At some time prior to or during 1982, Julius and Edmond Trump, each citizens of the Republic of South Africa and permanent residents of New York, purchased 30% of Wieboldt's outstanding shares by launching a takeover. After the takeover, the Trump brothers conveyed approximately one-half of these shares to Jerome Schottenstein and, directly or indirectly, to certain persons and entities affiliated with Mr. Schottenstein (collectively referred to as the "Schottenstein interests").[2] As a result of

---

1. Eight of Wieboldt's stores were located on property owned by the company, including the main store and executive offices at One North State Street ("One North State") in downtown Chicago. The other four stores were located on property leased by Wieboldt from suburban shopping centers.

2. According to the complaint, these entities and individuals are: the Schottenstein Stores Corporation, Charles H. Schottenstein, Gary Schottenstein, Geraldine Schottenstein (as trustee), Jay L. Schottenstein (individually and as trustee), Randee Schottenstein, Robert M. Schottenstein, Susan and Ann Schottenstein (as trustees), Saul Schottenstein, Ari Deshe, and Jon Diamond.

these transactions, the Schottenstein interests and the Trump brothers (through its agent, MBT Corporation) (collectively referred to as the "Trump interests") each owned approximately 15% of Wieboldt's then outstanding shares and became Wieboldt's controlling shareholders.[3]

Wieboldt's Board of Directors consisted of nine individuals. In late 1982, Mr. Schottenstein became the Chairman of the Board. He nominated Irving Harris, George Kolber, and Myron Kaplan to serve as directors. William W. Darrow, Robert A. Podesta, and David C. Keller also began serving in 1982. In 1984, MBT Corporation nominated James Jacobson and Albert Roth to the Wieboldt Board of Directors. These nine individuals served on the Board until December 19, 1985.

### b. Schedule A Shareholders

In addition to the Schottenstein and Trump interests, Wieboldt had a number of shareholders as of December 20, 1985 who owned more than 1,000 shares of Wieboldt's common stock. Wieboldt has listed these shareholders and the number of shares that they held on that date on a schedule which they have appended to their complaint ("Schedule A").[4] Directors Keller, Podesta and Darrow (the "insider shareholders") also owned more than 1,000 shares each.[5]

### c. The LBO Lenders and Related Entities

On November 20, 1985 WSI commenced a tender offer for all outstanding shares of Wieboldt's common stock, for all of Wieboldt's outstanding shares of preferred stock, and for all outstanding options to purchase Wieboldt's stock. The tender offer was financed through three related financial transactions between Wieboldt and certain lenders and affiliated parties.

These three transactions effected the LBO of Wieboldt.

Wieboldt has included as defendants in this action four of the entities which were involved in these financial transactions: One North State Street Limited Partnership ("ONSSLP"), State Street Venture ("SSV"), Boulevard Bank National Association ("Boulevard Bank"), BA Mortgage and International Realty Corporation ("BAMIR-CO"), and General Electric Credit Corporation ("GECC").[6] The roles these entities played in the tender offer and subsequent buyout are described below.

### B. THE TENDER OFFER AND RELATED TRANSACTIONS

By January, 1985 Wieboldt's financial health had declined to the point at which the company was no longer able to meet its obligations as they came due. On January 23, 1985 WSI sent a letter to Mr. Schottenstein in which WSI proposed a possible tender offer for Wieboldt common stock at $13.50 per share. The following day, Mr. Schottenstein informed Wieboldt's Board of Directors of the WSI proposal and the Board agreed to cooperate with WSI in evaluating the financial and operating records of the company. WSI proceeded to seek financing from several lenders, including Household Commercial Financial Services ("HCFS").

During 1985 it became apparent to Wieboldt's Board that WSI would accomplish its tender offer by means of an LBO through which WSI would pledge substantially all of Wieboldt's assets, including the company's fee and leasehold real estate assets, as collateral. Many of these real estate assets already served as collateral for $35 million in secured loan obligations from Continental Illinois National Bank ("CINB") and other bank creditors. Wie-

---

**3.** The Trump brothers, MBT Corporation, Mr. Schottenstein and the Schottenstein affiliates are collectively referred to in this opinion as "controlling shareholders."

**4.** The following Schedule A shareholders have already been dismissed in this action: Tessie Brown, Herbert E. Harper, William Jarvis, Alan J. Levine, Louis R. Pearlman, Ruby E. Prince, Morton Simpson, Carole G. Simpson, Robert P.

Wieboldt, and West Orange Orthopedic Association.

**5.** Keller owned 3,500 shares; Podesta owned 4,816 shares, and Darrow owned 2,078 shares.

**6.** These entities are collectively referred to in this opinion as "State Street defendants."

boldt was at least partially in default on these obligations at the time of the LBO.

In order to free these assets for use as collateral in obtaining tender offer financing, WSI intended to sell the One North State Street property and pay off the CINB loan obligations. In furtherance of these efforts, WSI entered into a joint venture with Bennett & Kahnweiler Associates ("BKA"), a real estate broker. WSI and BKA intended to sell the One North State Street property to a partnership for $30,-000,000. The partnership would then mortgage the property to a funding source. Accordingly, BKA applied for and BAMIRCO accepted a first mortgage term loan on the property.

The sale of the One North State Street property did not generate sufficient funds to pay off the CINB loan obligations. Consequently, WSI sought additional funds from GECC through the sale of Wieboldt's customer charge card accounts. GECC agreed to enter into an accounts purchase agreement after WSI acquired Wieboldt through the tender offer. One term of the accounts purchase agreement required Wieboldt to pledge all of its accounts receivable to GECC as additional security for Wieboldt's obligations under the agreement.

Thus, by October, 1985 HCFS, BAMIRCO, and GECC had each agreed to fund WSI's tender offer, and each knew of the other's loan or credit commitments.[7] These lenders were aware that WSI intended to use the proceeds of the financing commitments to (1) purchase tendered shares of Wieboldt stock; (2) pay surrender prices for Wieboldt stock options; or (3) eliminate CINB loan obligations.

The Board of Directors was fully aware of the progress of WSI's negotiations. The Board understood that WSI intended to finance the tender offer by pledging a substantial portion of Wieboldt's assets to its lenders, and that WSI did not intend to use any of its own funds or the funds of its shareholders to finance the acquisition. Moreover, although the Board initially believed that the tender offer would produce $10 million in working capital for the company, the members knew that the proceeds from the LBO lenders would not result in this additional working capital.

Nevertheless, in October, 1985 the Board directed Mr. Darrow and Wieboldt's lawyers to work with WSI to effect the acquisition. During these negotiations, the Board learned that HCFS would provide financing for the tender offer only if Wieboldt would provide a statement from a nationally recognized accounting firm stating that Wieboldt was solvent and a going concern prior to the planned acquisition and would be solvent and a going concern after the acquisition. Mr. Darrow informed WSI that Wieboldt would only continue cooperating in the LBO if HCFS agreed not to require this solvency certificate. HCFS acceded to Wieboldt's demand and no solvency certificate was ever provided to HCFS on Wieboldt's behalf.

On November 18, 1985 Wieboldt's Board of Directors voted to approve WSI's tender offer, and on November 20, 1985 WSI announced its offer to purchase Wieboldt stock for $13.50 per share.[8] By December 20, 1985 the tender offer was complete and WSI had acquired ownership of Wieboldt through its purchase of 99% of Wieboldt's stock at a total price of $38,462,164.00. All of the funds WSI used to purchase the tendered shares were provided by HCFS and were secured by the assets which BAMIRCO and GECC loan proceeds had freed from CINB obligations. After the LBO,

1. Wieboldt's One North State Street property was conveyed to ONSSLP

---

7. HCFS committed an amount sufficient to fund the offer; BAMIRCO committed $28 million; and GECC extended WSI a line of credit which was not to exceed $35 million.

8. Approximately 1,900 shareholders held the 2,765,574 shares of Wieboldt common stock that were outstanding on that date. As a result of the offer, Mr. Schottenstein and his affiliates tendered at least 416,958 shares and received $5,628,933.00 from WSI. MBT Corporation tendered the Trump brothers' 480,072 shares and received $6,480,972.00 from WSI. The Schedule A shareholders, Mr. Keller, Mr. Darrow and his wife, and Mr. Podesta also tendered their shares at the offer price.

as beneficiary of a land trust established with Boulevard Bank as trustee;

2. Substantially all of Wieboldt's remaining real estate holdings were subject to first or second mortgages to secure the HCFS loans; and

3. Wieboldt's customer credit card accounts were conveyed to GECC and Wieboldt's accounts receivable were pledged to GECC as security under the GECC accounts purchase agreement.

In addition, Wieboldt became liable to HCFS on an amended note in the amount of approximately $32.5 million.[9] Wieboldt did not receive any amount of working capital as a direct result of the LBO.

On September 24, 1986 certain of Wieboldt's creditors commenced an involuntary liquidation proceeding against Wieboldt under Chapter 7 of the United States Bankruptcy Code ("the Code"). On the same day, Wieboldt filed a voluntary reorganization proceeding pursuant to Chapter 11 of the Code. Wieboldt's Chapter 11 proceeding is entitled *In re Wieboldt Stores, Inc.,* 68 B.R. 578 (Bankr.N.D.Ill.1986) and is pending on the docket of Bankruptcy Judge Susan Pierson DeWitt of the United States Bankruptcy Court for the Northern District of Illinois.

## C. THE COMPLAINT

In its complaint, Wieboldt alleges that WSI's tender offer and the resulting LBO was a fraudulent conveyance under the federal bankruptcy statute and the Illinois fraudulent conveyance laws. Counts I, III, and V are based on Section 548(a)(1) of the Code, 11 U.S.C. § 548(a)(1). The essence of Count I is that the controlling and insider shareholders tendered their shares to WSI in response to WSI's offer with the actual intent to hinder, delay or defraud Wieboldt's unsecured creditors. Count III brings a similar claim against the State

Street defendants for their role in the sale of the One North State Street property. Likewise, Count V, which names GECC as defendant, claims that the pledging of Wieboldt's customer charge card accounts and other accounts receivable violated Section 548(a)(1).

Counts II, IV, VI, and VII are based on Section 548(a)(2) of the Code, 11 U.S.C. § 548(a)(2). Counts II and VII allege that the tender offer to Wieboldt shareholders (including the Schedule A shareholders) was a fraudulent conveyance because it and the resulting LBO "rendered Wieboldt insolvent or too thinly capitalized to continue in the business in which it was engaged...." (Complaint ¶¶ 113, 139). Count IV claims that the sale of the One North State Street property violated Section 548(a)(2); Count VI claims that the pledging of Wieboldt's accounts receivable violated Section 548(a)(2).

Count VIII alleges that each of the three transactions (the tender offer, the sale of One North State Street property, and the pledging of the Wieboldt accounts receivable) violated the Illinois fraudulent conveyance law, Ill.Rev.Stat. ch. 59, § 4. The essence of the claim in Count VIII is that Wieboldt did not receive fair consideration for the property it conveyed and was insolvent at the time of the conveyances. (Complaint ¶ 144).[10] In each of Counts I through VIII, Wieboldt seeks to avoid the transfer of assets made to the named defendants as a result of the LBO.

Finally, Counts IX, X and XI allege that the Board of Directors breached its fiduciary duty and violated Section 9.10(c)(1) of the Illinois Business Corporation Act ("IBCA") by cooperating in and approving the LBO notwithstanding its practical effect on Wieboldt's solvency and future as a going concern. Counts IX, X and XI seek $100 million in compensatory damages and the costs of bringing this lawsuit. In addi-

---

9. The amount of WSI's note to HCFS represents the $38 million that WSI paid to Wieboldt shareholders less an immediate payment on that amount from the proceeds of the One North State sale.

10. Count VII is brought against the controlling shareholders, the insider shareholders, the Schedule A shareholders, and the State Street defendants.

tion, Count X seeks $500 million in punitive damages from the directors.

## III. DISCUSSION

### A. RULE 12(b)(2) MOTIONS TO DISMISS

■ Several of the Schedule A defendants have filed motions to dismiss under Rule 12(b)(2) for lack of personal jurisdiction.[11] These defendants first contend that Bankruptcy Rule 7004(d), which provides for nationwide service of process in adversary bankruptcy proceedings, does not apply in civil actions brought under the Federal Rules of Civil Procedure.[12] However, amended Bankruptcy Rule 1001 makes the Bankruptcy Rules applicable to all cases and proceedings under Title 11 of the United States Code, whether before a district judge or a bankruptcy judge. *See* Bankr. Rule 1001 advisory committee note. Thus, Rule 7004(d) applies in this action.

■ These defendants also object to the application of Rule 7004(d) on the ground that a rule which permits nationwide service of process violates due process. The concept of due process requires that a defendant have certain "minimum contacts" with a forum such that "maintenance of the suit does not offend traditional notions of fair play and substantial justice." *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945). Defendants maintain that Rule 7004(d) violates the Constitution because it provides for nationwide service of process regardless of whether a party has minimum contacts with the forum state.

The Seventh Circuit has previously stated that in a federal question case where Congress has provided for nationwide service of process, minimum contacts between the defendant and the forum state is not required. *Fitzsimmons v. Barton*, 589 F.2d 330, 333 (7th Cir.1979). Although *Fitzsimmons* involved a case brought under Section 27 of the Security Exchange Act of 1934, 15 U.S.C. § 78aa (1976), the court quoted the broad language of the Supreme Court in *United States v. Union Pacific R.R.*, 98 U.S. 569, 25 L.Ed. 143 (1878), to support its proposition:

> There is ... nothing in the Constitution which forbids Congress to enact that, as to a class of cases or a case of special character, a circuit court—any circuit court—in which the suit may be brought, shall, by process served anywhere in the United States, have the power to bring before it all the parties necessary to its decision.

*Id.* 98 U.S. at 603–04. This conclusion has been applied specifically to uphold the validity of nationwide service of process under Rule 7004(d). *In re Van Huffel Tube Corp.*, 71 B.R. 145, 146 (Bankr.N.D.Ohio 1987); *In re Allegheny, Inc.*, 68 B.R. 183, 187 (Bankr.W.D.Pa.1986); *In re Self,* 51 B.R. 683, 685 (Bankr.N.D.Miss.1985); *In re B.W. Development Co., Inc.*, 49 B.R. 129, 131–32 (Bankr.W.D.Ky.1985).

This court sees no reason to reach the opposite conclusion. Each of these defendants resides in the United States and therefore has national minimum contacts. Rule 7004(d) therefore does not violate due process by permitting this court to exercise jurisdiction over these parties for the purposes of this proceeding.

### B. RULE 9(b) MOTIONS TO DISMISS

■ Certain moving defendants argue that Wieboldt's claims do not satisfy the requirements of Fed.R.Civ.P. 9(b). Rule 9(b) provides that:

> in all averments of fraud or mistake the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other con-

11. These defendants are: Weston Associates and Saugatuck Investments, Julian Jawitz, Abraham Hart, Elinor Rogosin, Edward J. Hart, Wallace Chomacke, Norte & Company, Samuel S. and Lorraine E. Pace, Wilfred Cohen, Gerald Olin, Suzanne Olin, Robert D. Goldfarb, Harley C. and Dorothy M. Guthrie, Samuel A. and Mary A. Caccamise, Sarah B. Dunkirk, Paul W. Beltz, Margaret Nichols, Robert Nichols, John J. Sullivan, and Rosemary B. Westbrook.

12. Bankruptcy Rule 7004(d) states: "The summons and complaint and all other process except a subpoena may be served anywhere in the United States."

ditions of mind of a person may be averred generally.

Rule 9(b) principles have been used to dismiss fraudulent conveyance claims which failed to meet the requirements of the Rule. *See e.g., Atlanta Shipping Corp., Inc. v. Chemical Bank,* 631 F.Supp. 335, 347–48 (S.D.N.Y.1986). However, a court must read Rule 9(b) in harmony with Fed. R.Civ.P. 8, which requires only a "short and plain statement of the claim showing that the pleader is entitled to relief." *Tomera v. Galt,* 511 F.2d 504, 508 (7th Cir. 1975).

Courts generally evaluate averments of fraud in the bankruptcy context more liberally than in other civil actions charging fraud. *In re Hollis & Co.,* 83 B.R. 588, 590 (Bankr.E.D.Ark.1988); *In re O.P.M. Leasing Services, Inc.,* 32 B.R. 199, 203 (Bankr. S.D.N.Y.1983); *In re McGuff,* 3 B.R. 66, 70 (Bankr.S.D.Cal.1980). To determine whether a pleading satisfies Rule 9(b), a court must consider the purposes of the rule:

> Complaints alleging fraud should seek redress for a wrong rather than attempting to discover unknown wrongs. Moreover, defendants must be protected from the harm that results from charges of serious wrongdoing, as well as the harm that comes to their reputations when they are charged with the commission of acts involving moral turpitude. Finally, allegations of fraud must be concrete and particularized enough to give notice to the defendants of the conduct complained of, to enable the defendants to prepare a defense. [Citations omitted.]

*D & G Enterprises v. Continental Illinois National Bank,* 574 F.Supp. 263, 266–67 (N.D.Ill.1983). *See also McKee v. Pope Ballard Shepard & Fowle Ltd.,* 604 F.Supp. 927, 930 (N.D.Ill.1985). A court must consider these principles in light of the Supreme Court's admonition that a complaint should be dismissed for failing to state a claim only when it appears beyond doubt that plaintiff cannot, under any set of facts, support the claim. *See Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957); *In re McGuff,* 3 B.R. 66, 70 (Bankr.S.D.Cal.1980).

The allegations of Wieboldt's complaint are well within the pleading requirement of Rule 9(b). Wieboldt's detailed and comprehensive complaint recites 107 paragraphs of supporting facts. Paragraphs 43 through 107 explain in detail the events surrounding the tender offer and the LBO. These paragraphs describe each defendant's participation in the LBO transaction, the effect of the LBO on Wieboldt after the transactions were complete, and the assets involved in the transactions. In addition, Wieboldt states clearly in each count the factual and legal basis for the claim in that count and the defendants against whom the claim is brought.

Although the size and complexity of this case renders pleading difficult, Wieboldt has included enough information in its complaint and has stated its claims with sufficient clarity to advise each defendant or group of defendants of the claims made against them. Pleadings are not intended to supplant the process of discovery; nor is Wieboldt required to plead the evidence it plans to present to support its claims. Wieboldt's complaint adequately describes the specific injury Wieboldt seeks to redress and describes the legal theories upon which it bases its claims. For these reasons and because the complaint pleads sufficient facts to allow each defendant to prepare an effective answer or defense, defendants' motions to dismiss under Rule 9(b) are denied.

## C. RULE 12(b)(6) MOTIONS TO DISMISS

The controlling shareholders, insider shareholders, Schedule A shareholders, and the State Street defendants move to dismiss the complaint on the grounds that Wieboldt has failed to state a claim under either the federal or the state fraudulent conveyance laws. In addition, the board of directors seek dismissal of the counts against them because Wieboldt has failed to state a claim for breach of fiduciary duty. Each of these assertions are discussed below.

The standard for dismissal under Rule 12(b)(6) is well established. In deciding whether to dismiss a complaint under Fed.

R.Civ.P. 12(b)(6), the court must accept the allegations of the complaint as true and must view the allegations in the light most favorable to the plaintiff. *Hishon v. King & Spaulding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984); *The Marmon Group, Inc. v. Rexnord,* 822 F.2d 31, 34 (7th Cir.1987). "A complaint should be dismissed for failure to state a claim only if it appears beyond doubt that the plaintiff is unable to prove any set of facts that would entitle the plaintiff to relief...." *Doe v. St. Joseph's Hospital,* 788 F.2d 411, 414 (7th Cir.1986).

### 1. *Applicability of Fraudulent Conveyance Law*

■ Both the federal Bankruptcy Code and Illinois law protect creditors from transfers of property that are intended to impair a creditor's ability to enforce its rights to payment or that deplete a debtor's assets at a time when its financial condition is precarious. Modern fraudulent conveyance law derives from the English Statute of Elizabeth enacted in 1570, the substance of which has been either enacted in American statutes prohibiting such transactions or has been incorporated into American law as a part of the English common law heritage. *See* Sherwin, "Creditors' Rights Against Participants in a Leveraged Buyout," 72 Minn.L.Rev. 449, 465–66 (1988).

The controlling shareholders, insider shareholders, and some of the Schedule A shareholders argue that fraudulent conveyance laws do not apply to leveraged buyouts. These defendants argue (1) that applying fraudulent conveyance laws to public tender offers effectively allows creditors to insure themselves against subsequent mismanagement of the company; (2) that applying fraudulent conveyance laws to LBO transactions and thereby rendering them void severely restricts the usefulness of LBOs and results in great unfairness; and (3) that fraudulent conveyance laws were never intended to be used to prohibit or restrict public tender offers.

Although some support exists for defendants' arguments,[13] this court cannot hold at this stage in this litigation that the LBO in question here is entirely exempt from fraudulent conveyance laws. Neither Section 548 of the Code nor the Illinois statute exempt such transactions from their statutory coverage. Section 548 invalidates fraudulent "transfers" of a debtor's property. Section 101(50) defines such a transfer very broadly to include "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in property, including retention of title as a security interest." 11 U.S.C. § 101(50). Likewise, the Illinois statute applies to gifts, grants, conveyances, assignments and transfers. Ill.Rev.Stat. ch. 59, ¶ 4. The language of these statutes in no way limits their application so as to exclude LBOs.

In addition, those courts which have addressed this issue have concluded that LBOs in some circumstances may constitute a fraudulent conveyance. *See e.g., Kupetz v. Continental Illinois National Bank and Trust,* 77 B.R. 754 (Bankr.C.D. Cal.1987), *aff'd Kupetz v. Wolf,* 845 F.2d 842 (9th Cir.1988) (applying Section 548 and the California statute, West's Ann.Cal.Civ. Code ¶¶ 3439–3439.12); *In re Ohio Corrugating Company,* 70 B.R. 920 (Bankr.N.D. Ohio 1987) (applying Section 548 and the Ohio statute, Ohio Rev.Code, Sect. 1336.01 *et seq.*); *In re Anderson Industries, Inc.,* 55 B.R. 922 (Bankr.W.D.Mich.1985) (applying Michigan law, M.C.L.A. § 566.11); and *United States v. Gleneagles Investment Co., Inc.,* 565 F.Supp. 556 (M.D.Pa.1983), *aff'd in part and remanded in part United States v. Tabor Court Realty,* 803 F.2d 1288 (3rd Cir.1986), *cert. denied, McClellan Realty Co. v. United States,* — U.S. ——, 107 S.Ct. 3229, 97 L.Ed.2d 735 (1987) (applying the Pennsylvania Uniform Fraudulent Conveyances Act, 39 P.S. § 351). *See also* Sherwin, "Creditor's Rights Against Participants in a Leveraged Buyout," 72 Minn.L.Rev. 449 (1988). Defendants have

---

**13.** *See, e.g.,* Baird & Jackson, "Fraudulent Conveyance Law and Its Proper Domain," 38 Vand. L.Rev. 829 (1985).

presented no case law which holds to the contrary.[14]

The court is aware that permitting debtors to avoid all LBO transfers through the fraudulent conveyance laws could have the effect of insuring against a corporation's subsequent insolvency and failure. *Anderson Industries, Inc.*, 55 B.R. at 926; *see also* Baird & Jackson, *supra* n. 11 at 839. In light of the case law and the broad statutory language, however, this court sees no reason to hold as a general rule that LBOs are exempt from the fraudulent conveyance laws. As the court stated in *Anderson*, "[i]f this holding is too broad in the light of the present marketplace, it is the legislature, not the courts, that must narrow the statute." 55 B.R. at 926.

### 2. *The Structure of the Transaction*

■ Although the court finds that the fraudulent conveyance laws generally are applicable to LBO transactions, a debtor cannot use these laws to avoid any and all LBO transfers. In this case, certain defendants argue that they are entitled to dismissal because the LBO transfers at issue do not fall within the parameters of the laws. These defendants argue that they are protected by the literal language of Section 548 of the Code and the "good faith transferee for value" rule in Section 550.[15] They contend, initially, that they did not receive Wieboldt property during the tender offer and, secondarily, that, even if they received Wieboldt property, they tendered their shares in good faith, for value, and without the requisite knowledge and therefore cannot be held liable under Section 550.

The merit of this assertion turns on the court's interpretation of the tender offer and LBO transactions. Defendants contend that the tender offer and LBO were composed of a series of interrelated but independent transactions. They assert, for example, that the transfer of property from HCFS to WSI and ultimately to the shareholders constituted one series of several transactions while the pledge of Wieboldt assets to HCFS to secure the financing constituted a second series of transactions. Under this view, defendants did not receive the *debtor*'s property during the tender offer but rather received *WSI*'s property in exchange for their shares.

Wieboldt, on the other hand, urges the court to "collapse" the interrelated transactions into one aggregate transaction which had the overall effect of conveying Wieboldt property to the tendering shareholders and LBO lenders. This approach requires the court to find that the persons and entities receiving the conveyance were direct transferees who received "an interest of the debtor in property" during the tender offer/buyout, and that WSI and any other parties to the transactions were "mere conduits" of Wieboldt's property. If the court finds that all the transfers constituted one transaction, then defendants received property from Wieboldt and Wieboldt has stated a claim against them.

■ Few courts have considered whether complicated LBO transfers should be evaluated separately or collapsed into one integrated transaction. However, two United States Courts of Appeals opinions provide some illumination on this issue.

---

**14.** *Cf. Credit Managers Ass'n of Southern California v. Federal Company,* 629 F.Supp. 175, 179 (C.D.Cal.1985), in which a California court expressed reservations about extending fraudulent conveyance law to leveraged buyouts but specifically reserved the issue in its decision.

**15.** While Section 548 defines the nature of the transactions that are avoidable by the debtor, Section 550 places limits on Section 548 by defining the kind of transferee from whom a debtor may recover transferred property. Section 550(a) permits a trustee to recover fraudulently transferred property from

    1. the initial transferee;

    2. the entity for whose benefit such transfer was made; or

    3. an immediate or mediate transferee of such initial transferee (a "subsequent transferee").

11 U.S.C. § 550(a). Section 550(b) states that a trustee may *not* recover from

    1. a subsequent transferee who takes the property for value, in good faith, and without knowledge of the voidability of the transfer; or

    2. an immediate or mediate good faith transferee of such a transferee.

11 U.S.C. § 550(b).

*See Kupetz v. Wolf,* 845 F.2d 842 (9th Cir.1988); *United States v. Tabor Court Realty,* 803 F.2d 1288 (3rd Cir.1986), *cert. denied McClellan Realty Co. v. United States,* —— U.S. ——, 107 S.Ct. 3229, 97 L.Ed.2d 735 (1987).

In *Kupetz,* the debtor corporation (Wolf & Vine) was owned in equal shares by an individual, Morris Wolf, and the Marmon Group. When Mr. Wolf retired, Marmon decided to sell the company and concluded that David Adashek was a suitable buyer. Mr. Adashek subsequently obtained control of the company through a series of transactions which constituted an LBO.[16] Thereafter, Wolf & Vine could not service the additional debt that resulted from the buyout. The company eventually filed for bankruptcy under Chapter 11 of the Code.

The dispute before the district court resulted when the trustee in bankruptcy sought to avoid the LBO transfers on the grounds that the manner in which the sale was financed constituted a fraudulent conveyance to Mr. Wolf and the Marmon Group. After the case proceeded to a jury trial, the district court directed a verdict in favor of the selling shareholders on the fraudulent conveyance claims. 845 F.2d at 844–45. The trustees appealed.

The Ninth Circuit affirmed the district court's decision and declined to strike down the LBO on fraudulent conveyance grounds. The court concluded that the trustee could not avoid the transfer to the shareholders because (1) they did not sell their shares in order to defraud Wolf & Vine's creditors; (2) they did not know that Mr. Adashek intended to leverage the com-

pany's assets to finance the purchase of shares; and (3) the LBO had the indicia of a straight sale of shares and was not Wolf & Vine's attempt to redeem its own shares.[17] 845 F.2d at 848–50. However, the Ninth Circuit in its opinion in *Kupetz* stated:

> In an LBO, the lender, by taking a security interest in the company's assets, reduces the assets available to creditors in the event of failure of the business. The form of the LBO, while not unimportant, does not alter this reality. Thus, where the parties in an LBO fully intend to hinder the general creditors and benefit the selling shareholders the conveyance is fraudulent under [the fraudulent conveyance laws].

845 F.2d at 846.

In *Kupetz* the Ninth Circuit discussed shareholder liability under the fraudulent conveyance laws. The Third Circuit in *United States v. Tabor Court,* 803 F.2d 1288 (3rd Cir.1986), *cert. denied McClellan Realty Co. v. United States,* —— U.S. ——, 107 S.Ct. 3229, 97 L.Ed.2d 735 (1987), addressed the liability of an LBO lender.[18] In *Tabor Court,* the controlling shareholders of the debtor corporation (Raymond Group) solicited a purchaser for the company. The purchaser formed a holding company (Great American) to purchase Raymond Group's outstanding shares. Great American acquired Raymond Group by borrowing funds from a third party lender (IIT) and securing the loan with both first and second mortgages on Raymond Group's assets.[19] After the company failed and many

---

**16.** These transactions were:
1. Mr. Adashek formed Little Red Riding Hood (Riding Hood) with $100.00 in capital;
2. Riding Hood purchased all of the shares of Wolf & Vine for $3 million;
3. Riding Hood financed the transaction with a $1.1 million loan from CINB and the Bank issued letters of credit in favor of the sellers for the remaining amount;
4. Riding Hood merged into Wolf & Vine and Wolf & Vine assumed Riding Hood's obligation to the sellers;
5. Wolf & Vine pledged its assets to the bank to secure the loan and the letters of credit.
845 F.2d at 844.

**17.** In addition, the court was comforted by the fact that the trustee did not represent any unsecured creditor that had a claim prior to the LBO.

**18.** The court decided *Tabor Court* on the basis of Pennsylvania's version of the Uniform Fraudulent Conveyances Act ("UFCA"), 39 Pa.Stat. §§ 354–357. 803 F.2d at 1291. However, the basic principles in the case are equally applicable to cases decided under the Code.

**19.** The loan proceeds went from the lender to the debtor corporation, who turned them over immediately to the holding company, which used the funds to purchase shares. 803 F.2d at 1302.

of its assets had been sold to various investment groups, the United States government sought to reduce to judgment certain tax liens on Raymond Group's property and satisfy the judgments out of assets which the company owned before it mortgaged those assets to secure the LBO funds. 803 F.2d at 1291–94.

The Third Circuit affirmed the district court's conclusion that the mortgages that the Raymond Group gave to IIT were fraudulent conveyances within the meaning of the constructive and intentional fraud sections of the Pennsylvania UFCA. 803 F.2d at 1296. In affirming the district court, the Third Circuit noted that all three parties—the lender, the debtor, and the purchaser—participated in the loan negotiations, and that IIT therefore knew of the purpose to which Great American intended to put the loan proceeds. *Id.* The court held that the district court, in interpreting the LBO, correctly integrated the series of transactions because the Raymond Group merely served as a conduit for the transfer between IIT and Great American (and ultimately to the shareholders), and did not receive the funds as any form of consideration. 803 F.2d at 1302.

Neither of these cases involved transactions which were identical to the WSI–Wieboldt buyout. However, the *Kupetz* and *Tabor Court* opinions are nonetheless significant because the courts in both cases expressed the view that an LBO transfer—in whatever form—was a fraudulent conveyance if the circumstances of the transfer were not "above board." *Kupetz*, 845 F.2d at 847. Thus, even though the court in *Kupetz* declined to hold the selling shareholders liable, there was no showing in *Kupetz* that the shareholders intended to defraud Wolf & Vine's creditors nor even knew that the purchaser intended to finance the takeover by leveraging the company's assets. On the other hand, the court in *Tabor Court* found the LBO lender liable because it participated in the nego-

tiations surrounding the LBO transactions and knew that the proceeds of its loan to Great American would deplete the debtor's assets to the point at which it was functionally insolvent under the fraudulent conveyance and bankruptcy laws. These cases indicate that a court should focus not on the formal structure of the transaction but rather on the knowledge or intent of the parties involved in the transaction.

Applying this principle to defendants' assertions, it is clear that, at least as regards the liability of the controlling shareholders, the LBO lenders, and the insider shareholders, the LBO transfers must be collapsed into one transaction. The complaint alleges clearly that these participants in the LBO negotiations attempted to structure the LBO with the requisite knowledge and contemplation that the full transaction, tender offer and LBO, be completed.[20] The Board and the insider shareholders knew that WSI intended to finance its acquisition of Wieboldt through an LBO (Complaint ¶¶ 51, 72) and not with any of its own funds (Complaint ¶ 69). They knew that Wieboldt was insolvent before the LBO and that the LBO would result in further encumbrance of Wieboldt's already encumbered assets. (Complaint ¶¶ 44, 53, 54, 73, 75–78, 88). Attorneys for Schottenstein Stores apprised the Board of the fraudulent conveyance laws and suggested that they structure the LBO so as to avoid liability. (Complaint ¶¶ 81, 82). Nonetheless, these shareholders recommended that Wieboldt accept the tender offer and themselves tendered their shares to WSI. (Complaint ¶¶ 91, 95, 97, 99, 100, 101).

Wieboldt's complaint also alleges sufficient facts to implicate the LBO lenders in the scheme. HCFS, BAMIRCO and GECC were well aware of each other's loan or credit commitments to WSI and knew that WSI intended to use the proceeds of their financing commitments to purchase Wieboldt shares or options and to release cer-

---

**20.** Although many of the allegations in the complaint refer to the state of mind and activities of the Board of Directors, these allegations may fairly be imputed to the controlling shareholders. The controlling shareholders nominated a majority of the directors to their positions on the Board. In addition, many of the individuals who served on the Board were "insiders" to Schottenstein Stores, Inc. or MBT Corporation.

tain Wieboldt assets from prior encumbrances. (Complaint ¶¶ 66, 67). Representatives of the lenders received the same information concerning the fraudulent conveyance laws as did the Board of Directors. (Complaint ¶ 80).[21] These LBO lenders agreed with WSI and the Board of Directors to structure the LBO so as to avoid fraudulent conveyance liability. (Complaint ¶ 82).

The court, however, is not willing to "collapse" the transaction in order to find that the Schedule A shareholders also received the debtor's property in the transfer. While Wieboldt directs specific allegations of fraud against the controlling and insider shareholders and LBO lenders, Wieboldt does not allege that the Schedule A shareholders were aware that WSI's acquisition encumbered virtually all of Wieboldt's assets. Nor is there an allegation that these shareholders were aware that the consideration they received for their tendered shares was Wieboldt property. In fact, the complaint does not suggest that the Schedule A shareholders had any part in the LBO except as innocent pawns in the scheme. They were aware only that WSI made a public tender offer for shares of Wieboldt stock. (Complaint ¶ 98). Viewing the transactions from the perspective of the Schedule A shareholders and considering their knowledge and intent, therefore, the asset transfers to the LBO lenders were indeed independent of the tender offer to the Schedule A shareholders.

This conclusion is in accord with the purpose of the fraudulent conveyance laws. The drafters of the Code, while attempting to protect parties harmed by fraudulent conveyances, also intended to shield innocent recipients of fraudulently conveyed property from liability. Thus, although Subsection (a) of Section 550 permits a trustee to avoid a transfer to an initial transferee or its subsequent transferee, Subsection (b) of that Section limits recovery from a subsequent transferee by pro-

viding that a trustee may not recover fraudulently conveyed property from a subsequent transferee who takes the property in good faith, for value, and without knowledge that the original transfer was voidable.[22] Subsection (b) applies, however, only to subsequent transferees.

Similarly, the LBO lenders and the controlling and insider shareholders of Wieboldt are direct transferees of Wieboldt property. Although WSI participated in effecting the transactions, Wieboldt's complaint alleges that WSI was a corporation formed solely for the purpose of acquiring Wieboldt stock. The court can reasonably infer from the complaint, therefore, that WSI served mainly as a conduit for the exchange of assets and loan proceeds between LBO lenders and Wieboldt and for the exchange of loan proceeds and shares of stock between the LBO lenders and the insider and controlling shareholders. On the other hand, the Schedule A shareholders are not direct transferees of Wieboldt property. From their perspective, WSI was the direct transferee of Wieboldt property and the shareholders were merely indirect transferees because WSI was an independent entity in the transaction.

In sum, the formal structure of the transaction alone cannot shield the LBO lenders or the controlling and insider shareholders from Wieboldt's fraudulent conveyance claims. These parties were aware that the consideration they received for their financing commitments or in exchange for their shares consisted of Wieboldt assets and not the assets of WSI or any other financial intermediary. The Schedule A shareholders, on the other hand, apparently unaware of the financing transactions, participated only to the extent that they exchanged their shares for funds from WSI. Therefore, based on the allegations in the complaint, the court concludes that:

---

**21.** Because of the close association between BAMIRCO and the other State Street defendants, the court can impute BAMIRCO's knowledge to the other defendants for the purpose of this motion to dismiss. (Complaint, ¶¶ 37, 38).

**22.** Section 550(b) also prohibits a trustee from recovering such property from a good faith transferee of such a transferee.

1. the motions to dismiss filed by the LBO lenders, insider shareholders, and controlling shareholders are denied at this point because these parties received Wieboldt property through a series of integrated LBO transactions; and

2. the Schedule A shareholders' motions to dismiss are granted because these defendants did not receive Wieboldt property through the separate exchange of shares for cash.[23]

### 3. *The Elements of a Fraudulent Conveyance*

As discussed above, the transfers to and between the debtor and the LBO lenders, controlling shareholders, and insider shareholders are subject to the provisions in Section 548(a) of the Code and Section 4 of the Illinois statute. The court now must determine whether Wieboldt's complaint states sufficient facts to allege the elements of these causes of action.

#### a. Section 548(a)(1)

In order to state a claim for relief under Section 548(a)(1) of the Code, a debtor or trustee must allege (1) that the transfer was made within one year before the debtor filed a petition in bankruptcy, and (2) that the transfer was made with the actual intent to hinder, delay or defraud the debtor's creditors. 11 U.S.C. § 548(a)(1). *See In re F & C Services, Inc.*, 44 B.R. 863, 871–72 (Bankr.S.D.Fla.1984). Although defendants do not dispute that the LBO transfers occurred within a year of the date on which Wieboldt filed for bankruptcy, they vigorously assert that Wieboldt has failed to properly allege "intent to defraud" as required by Section 548(a)(1).

"Actual intent" in the context of fraudulent transfers of property is rarely susceptible to proof and "must be gleaned from inferences drawn from a course of conduct." *In re Vecchione*, 407 F.Supp. 609, 615 (E.D.N.Y.1976). A general scheme or plan to strip the debtor of its assets without regard to the needs of its creditors can support a finding of actual intent. *In re F & C Services*, 44 B.R. at 872. In addition, certain "badges of fraud" can form the basis for a finding of actual intent to hinder, delay or defraud. 4 *Collier on Bankruptcy* ¶ 548.02[5] (15th ed. 1987).[24]

Counts I and III of Wieboldt's complaint state a claim under Section 548(a)(1). Count I, which Wieboldt brings against the controlling and insider shareholders, states that these defendants exchanged their shares with the actual intent to hinder, delay or defraud Wieboldt's unsecured creditors. (Complaint, ¶ 109). Count III states that the State Street defendants received Wieboldt's interest in One North State Street property with the actual intent to defraud Wieboldt's unsecured creditors. (Complaint ¶ 118). The complaint also states generally that the LBO Lenders and the controlling and insider shareholders structured the LBO transfers in such a way as to attempt to evade fraudulent conveyance liability. (Complaint ¶¶ 80–83). These allegations are a sufficient assertion of actual fraud. Defendants' motions to dismiss Counts I and III are therefore denied.

#### b. Section 548(a)(2)

Unlike Section 548(a)(1), which requires a plaintiff to allege "actual fraud," Section 548(a)(2) requires a plaintiff to allege only constructive fraud. A plaintiff states a

---

**23.** The following Schedule A shareholders have neither filed motions to dismiss in this action nor been dismissed by a prior order of this court: Paul Beltz, Gunnar Benson, Eva L. Bohlinger, Louis Cohen, Alan S. Emory, Elizabeth J. Hahn, Charles B. Wieboldt, Richard G. Harper, Vasilios Hatseras, Soula Hatseras, Margaret Horton, Ralph Jacobson, Vivian Jacobson, Leon Malman, Miltown Industrial Sites, Inc., Maro L. Wieboldt, Gladys Yan, Robert G. Chin, and Norman Zarick.

**24.** For example, when a debtor conceals a fact or makes false pretenses, reserves rights in the property which is transferred, or creates a closely held corporation to receive the transfer, or when the value of the transfer is unconscionably greater than the consideration received for it, the transaction is said to bear the "badge of fraud." 4 *Collier on Bankruptcy* ¶ 548.02[4] (15th ed. 1987).

claim under Section 548(a)(2) by alleging that the debtor (1) transferred property within a year of filing a petition in bankruptcy; (2) received less than the reasonably equivalent value for the property transferred; and (3) either (a) was insolvent or became insolvent as a result of the transfer, (b) retained unreasonably small capital after the transfer, or (c) made the transfer with the intent to incur debts beyond its ability to pay. 11 U.S.C. § 548(a)(2).

■ Defendants argue that Wieboldt's allegation of insolvency is insufficient as a matter of law to satisfy the insolvency requirement in Section 548(a)(2)(B)(i). Section 101(31)(A) of the Code defines "insolvency" as a condition which occurs when the sum of an entity's debts exceeds the sum of its property "at a fair valuation." 11 U.S.C. § 101(31)(A). Wieboldt's complaint alleges that the corporation was insolvent in November, 1985 "in that the fair saleable value of its assets was exceeded by its liabilities when the illiquidity of those assets is taken into account." (Complaint, ¶¶ 112, 121).

Wieboldt's allegations satisfy the "insolvency" requirement of Section 548(a)(2)(B)(i). Defendants' attempt to distinguish Wieboldt's phrase "fair saleable value" from Section 101(31)(A)'s "fair valuation" is, as Wieboldt suggests, "hypertechnical." (Mem. in Opp. at 66). "Fair valuation" is near enough in meaning to "fair value of saleable assets" to defeat defendants' motion to dismiss. *See In re A. Fassnacht & Sons, Inc.*, 45 B.R. 209, 217 (Bkrtcy.E.D.Tenn.1984). In addition, Wieboldt did not destroy its claim of insolvency by characterizing its assets as "illiquid" at the time of the transfer. In determining "fair valuation," a court must consider the property's intrinsic value, selling value, and the earning power of the proper-

ty. *Black's Law Dictionary*, 538 (5th Ed. 1979). Assets may be reduced by the value of the assets that cannot be readily liquidated. *Briden v. Foley*, 776 F.2d 379, 382 (1st Cir.1985). The complaint meets the financial condition test of Section 548(a)(2)(B)(i).

■ Finally, defendants claim that Wieboldt cannot state a claim under Section 548(a)(2) because it received "reasonably equivalent value" in the transfer to the shareholders and the conveyance of the One North State Street property. Wieboldt granted a security interest in substantially all of its real estate assets to HCFS and received from the shareholders in return 99% of its outstanding shares of stock.[25] (Complaint ¶¶ 102, 103(b)). This stock was virtually worthless to Wieboldt. *In re Roco Corp.*, 701 F.2d 978, 982 (1st Cir.1983); *In re Ipswich Bituminous Concrete Products, Inc.*, 79 B.R. 511, 517 (Bkrtcy.D.Mass.1987); *In re Corporate Jet Aviation, Inc.*, 45 B.R. 629, 634 (Bkrtcy. N.D.Ga.1985). *See also Hyde Properties v. McCoy*, 507 F.2d 301, 307 (6th Cir.1974) (decided under the Tennessee fraudulent conveyance statute, T.C.A. § 64-311, 64-312). Wieboldt received less than a reasonably equivalent value in exchange for an encumbrance on virtually all of its non-inventory assets, and therefore has stated a claim against the controlling and insider shareholders.

Likewise, the court need not dismiss Wieboldt's Section 548(a)(2) claim against the State Street defendants on the grounds that Wieboldt received reasonably equivalent value in exchange for its One North State Street property. The effect and intention of the parties to the One North State Street conveyance was to generate funds to purchase outstanding shares of Wieboldt stock. Although Wieboldt sold the property to ONSSLP for $30 million,[26]

**25.** Defendants argue that WSI (and not Wieboldt) received the outstanding shares of Wieboldt stock. However, a court analyzing an allegedly fraudulent transfer must direct its attention to "what the Debtor surrendered and what the Debtor received, irrespective of what any third party may have gained or lost." *In re Ohio Corrugating Co.*, 70 B.R. 920, 927 (Bkrtcy.

N.D.Ohio 1987). As discussed in Section C.2. of this opinion, the court considers the tender offer and buyout transfers as one transaction for the purposes of this motion.

**26.** In reality, Wieboldt conveyed the property to ONSSLP as beneficiary of a land trust with

and used the proceeds to pay off part of the $35 million it owed CINB, Wieboldt did not receive a benefit from this transfer. (Complaint ¶¶ 56, 58). *See Tabor Court,* 803 F.2d at 1300. Defendants knew that the conveyance would neither increase Wieboldt's assets nor result in a net reduction of its liabilities. In fact, all parties to the conveyance were aware that the newly unencumbered assets would be immediately remortgaged to HCFS to finance the acquisition. (Complaint ¶ 104). According to the complaint, therefore, Wieboldt received less than reasonably equivalent value for the conveyance of the One North State Street property and has stated a claim against the State Street defendants under Section 548(a)(2).

In sum, Counts II and IV of Wieboldt's complaint state a claim under Section 548(a)(2). Defendants' motions to dismiss these counts are denied.

c. Illinois Fraudulent Conveyance Law

Under Section 544(b) of the Code, a trustee may avoid transfers that are avoidable under state law if there is at least one creditor at the time who has standing under state law to challenge the transfer. 11 U.S.C. § 544(b).[27] Wieboldt utilizes this section to pursue a claim under the Illinois fraudulent conveyance statute, Ill.Rev.Stat. ch. 59, § 4.

The Illinois fraudulent conveyance statute is similar to Section 548 of the Code. The statute provides that:

> Every gift, grant, conveyance, assignment or transfer of, or charge upon any estate, real or personal, ... made with the intent to disturb, delay, hinder or defraud creditors or other person, ... shall be void as against the creditors, purchasers and other persons.

Ill.Rev.Stat. ch. 59, § 4 (1976). Illinois courts divide fraudulent conveyances into two categories: fraud in law and fraud in fact. *Tcherepnin v. Franz,* 475 F.Supp. 92, 96 (N.D.Ill.1979). In fraud in fact cases, a court must find a specific intent to defraud creditors; in fraud in law cases, fraud is presumed from the circumstances. *Id.*

Count VIII of Wieboldt's complaint purports to state a claim against the insider and controlling shareholders, Schedule A shareholders, and State Street defendants for fraud in law. Fraud in law occurs when a debtor makes a voluntary transfer without consideration, and the transfer impairs the rights of creditors. *Tcherepnin v. Franz,* 457 F.Supp. 832, 836 (N.D.Ill. 1978). To state a claim for fraud in law, a plaintiff must allege: (1) a voluntary gift; (2) an existing or contemplated indebtedness against the debtor; and (3) the failure of the debtor to retain sufficient property to pay the indebtedness. *United States ex rel. Hartigan v. Alaska,* 661 F.Supp. 727, 729 (N.D.Ill.1987); *Tcherepnin,* 457 F.Supp. at 836. Wieboldt's complaint alleges that the LBO transfers were fraudulent because "Wieboldt did not receive fair consideration for the property it conveyed and was insolvent at the time of the conveyance because it was then unable to meet its obligations as they became due." (Complaint ¶ 144).

▪ Wieboldt's complaint clearly alleges the elements of fraud in law. Although Wieboldt's complaint does not specifically allege that it made a "voluntary gift," a transfer for grossly inadequate consideration is deemed to be a "voluntary gift" under Illinois law. *Indiana National Bank v. Gamble,* 612 F.Supp. 1272, 1276 (N.D.Ill.1984). As previously discussed, Wieboldt did not receive a benefit from these transfers. *See* Section III.C.a(2) of this opinion. Second, Wieboldt clearly was

---

Boulevard Bank as trustee. (Complaint ¶ 103(a)).

**27.** Defendants challenge Wieboldt's standing to assert a claim under Section 544(b) because it has failed to identify a single creditor who could have challenged the transactions at the time they occurred. Again, defendants' reading of the complaint is hypertechnical. By January,

1985 Wieboldt was without sufficient working capital to pay at least $7 million in company obligations. (Complaint ¶ 43). Moreover, it was in default on its obligations to CINB at the time of the LBO. (Complaint ¶ 55). The court can fairly infer from these facts that a creditor existed who could have challenged the LBO transfers at the time they occurred.

obligated to a number of entities at the time of the transfers and in fact had defaulted on its obligations to CINB. (Complaint ¶¶ 43, 55). Finally, Wieboldt alleges that the LBO transfers rendered it insolvent. (Complaint ¶ 44). An insolvent corporation does not have sufficient assets to repay its obligations. The complaint therefore satisfies the elements of fraud in law under Section 4.

■ Defendants nevertheless assert that Wieboldt cannot state a claim under the Illinois statute because the "bona fide purchaser" rule in Section 5 protects them from liability. Section 5 of Chapter 59 provides:

[Section 4] shall not affect the title of a purchaser for a valuable consideration, unless it appears that he had notice of the fraudulent intent of his immediate grantor, or of the fraud rendering void the title of such grantor.

Ill.Rev.Stat. ch. 59, ¶ 5 (1976).

The court need not dismiss the complaint on the ground that Wieboldt failed to negate the elements of Section 5. Section 5 provides an affirmative defense to charges that an entity received a fraudulent conveyance. *See Tcherepnin v. Franz*, 485 F.2d 1251, 1259 (7th Cir.1973), *cert. denied McGurren v. Ettelson*, 415 U.S. 918, 94 S.Ct. 1416, 39 L.Ed.2d 472 (1974). A plaintiff is not required to plead facts showing that the defendants are *not* bona fide purchasers of the property. *Cf. Reagan v. Baird*, 94 Ill.Dec. 151, 158, 487 N.E.2d 1028, 140 Ill.App.3d 58 (1985), where the court held that a plaintiff need not establish that the transferee knew of or participated in the fraud in order to set aside a fraudulent conveyance.

In sum, the court cannot dismiss Wieboldt's claim under Section 4 of the Illinois statute. Defendants' motion to dismiss Count VIII is denied.

### 4. *Breach of Fiduciary Duty*

Counts IX and X of Wieboldt's complaint purport to state a claim for relief against Wieboldt's former Board of Directors for breach of fiduciary duty. The complaint alleges that the directors owed Wieboldt a fiduciary duty of "utmost good faith, care, and loyalty" when dealing with the corporation and was required to investigate thoroughly corporate transactions such as the LBO. (Complaint, ¶¶ 147, 149). The complaint also alleges that the directors owed a duty to Wieboldt's unsecured creditors to preserve the corporation's assets. (Complaint ¶ 148). Wieboldt alleges that the Board of Directors breached these duties "by assisting in the formulation and completion of the LBO" despite Wieboldt's insolvency and knowing that the LBO would injure Wieboldt's unsecured creditors. (Complaint ¶ 150).

■ The defendant directors first argue that Wieboldt does not have standing to bring an action against the directors for breach of fiduciary duty. Wieboldt, however, as a trustee in bankruptcy, has the right to bring any action in which the debtor has in interest, including actions against the debtor's officers and directors for breach of duty or misconduct. *Koch Refining v. Farmers Union Cent. Exchange, Inc.*, 831 F.2d 1339, 1348 (7th Cir.1987), *cert. denied*, —— U.S. ——, 108 S.Ct. 1077, 99 L.Ed.2d 237 (1988); *Delgado Oil Co., Inc. v. Torres*, 785 F.2d 857, 860 (10th Cir.1986). "In that capacity, the trustee acts to benefit the debtor's estate, which ultimately will benefit the debtor's creditors upon distribution." *Koch*, 831 F.2d at 1348.

The directors contend that the principles the Supreme Court enunciated in *Bangor Punta Operations, Inc. v. Bangor & Aroostook Railroad Company*, 417 U.S. 703, 94 S.Ct. 2578, 41 L.Ed.2d 418 (1974), preclude Wieboldt from asserting a claim for breach of fiduciary duty against Wieboldt's former directors. In *Bangor Punta*, the Supreme Court held that principles of equity precluded a corporation's new majority shareholder from maintaining an action against the company's former owners for corporate waste and mismanagement. The Court reasoned that, although the suit was purportedly brought on behalf of the corporation, the principal beneficiary of a recovery from the former owners was the new majority shareholder. Because

the new majority shareholder bought its holding from the former owners at a depressed price which already reflected the effects of the earlier mismanagement, any recovery would constitute a "windfall." 94 S.Ct. at 2584. Likewise, the directors in this case assert that equity precludes Wieboldt from maintaining this action against Wieboldt's former directors because the principal beneficiary of any recovery in this action will be WSI.

Wieboldt, on the other hand, argues that it has filed its action against the directors, not on behalf of WSI's equity interest, but on behalf of itself as a corporate entity and on behalf of its unsecured creditors. In *Bangor Punta*, the Supreme Court rejected the majority shareholder's similar argument that it brought its action in the name of the corporation and not on its own behalf and stated:

> Although a corporation and its shareholders are deemed separate entities for most purposes, the corporate form may be disregarded in the interests of justice where it is used to defeat an overriding public policy. In such cases courts of equity, piercing all fictions and disguises, will deal with the substance of the action and not blindly adhere to the corporate form. Thus, where equity would preclude the shareholders from maintaining an action in their own right, the corporation would also be precluded.

94 S.Ct. at 2584. 'The Supreme Court's language requires the conclusion that Wieboldt may not pursue its cause of action against the directors on behalf of itself as a corporate entity.

However, the *Bangor Punta* decision does not require the court to dismiss in their entirety Wieboldt's claims for breach of fiduciary duty. Unlike the plaintiff in *Bangor Punta*, Wieboldt is a debtor-in-possession under Chapter 11 of the Bankruptcy Code, and brings Count IX and X on behalf of its unsecured creditors. Wieboldt's creditors have suffered a direct injury as a result of the Board's alleged wrongdoing and will benefit from any recovery from the directors. The creditors cannot receive a "windfall" recovery, but

may recover only to the extent of their claims. By contrast, the *Bangor Punta* Court specifically noted that the plaintiff brought its cause of action on its own behalf, not on behalf of its creditors. 94 S.Ct. at 2587, n. 15. *See also* Justice Marshall's dissenting opinion, 94 S.Ct. at 2591. Wieboldt therefore is entitled to maintain an action against the Board of Directors on behalf of its unsecured creditors.

The directors nevertheless insist that Wieboldt may not bring this action even on behalf of its unsecured creditors because it may not assert "personal" claims of particular creditors. *See Koch Refining v. Farmers Union Cent. Exchange, Inc.*, 831 F.2d 1339, 1348 (7th Cir.1987), *cert. denied,* — U.S. ——, 108 S.Ct. 1077, 99 L.Ed.2d 237 (1988). In *Koch*, the Seventh Circuit held that a trustee may only maintain a general claim, not a claim for which recovery would be "peculiar and personal to the claimant." *Id.* at 1349. The court stated:

> A cause of action is 'personal' if the claimant himself is harmed and no other claimant or creditor has an interest in the cause. But allegations that could be asserted by any creditor could be brought by the trustee as a representative of all creditors. If the liability is to all creditors of the corporation without regard to the personal dealings between such officers and such creditors, it is a general claim.

*Id.*

Wieboldt is not asserting "personal" claims of particular creditors. The complaint alleges that Wieboldt is the corporate victim of the Board's poor management and that consequently its unsecured creditors have suffered harm as well. Wieboldt alleges that the Board's actions resulted in a depletion of the assets available to repay the claims of its unsecured creditors. The complaint does not identify any specific loss to a creditor in its individual capacity. If Wieboldt succeeds in its claim against the directors, no particular creditor will benefit from the recovery to any greater extent than any other. Wieboldt, as debtor-in-possession of its bankrupt estate, clearly may assert a claim for breach of

fiduciary duty on behalf of its group of unsecured creditors.

█ The directors further insist that Wieboldt nonetheless may not represent the interests of any *post-transaction* creditor. Citing *REA Express, Inc. v. Travelers Ins. Co.*, 406 F.Supp. 1389 (D.D.C.1976), *aff'd in part and modified in part* 554 F.2d 1200 (1977), *cert. denied* 434 U.S. 858, 98 S.Ct. 182, 54 L.Ed.2d 131 (1977), defendants assert that a post-transaction creditor of a bankrupt corporate debtor should have known of the debtor's financial condition when entering into its credit transaction. They argue that a post-transaction creditor who is allowed to recover in a subsequent lawsuit would receive more than the value of the bargain it freely entered into and would be unjustly enriched.

At this stage of the litigation, the court need not identify the particular creditors or group of creditors which will be entitled to share in any funds Wieboldt recovers from the directors. This proceeding is collateral to Wieboldt's Chapter 11 bankruptcy proceeding. The claims of each individual creditor will be adjudicated in the reorganization. The trustee and the bankruptcy court can subordinate the claims of any creditors who are not entitled to reimbursement from the Chapter 11 estate pursuant to Section 510(c) of the Code at the time of distribution.[28] Consequently, the court need not exclude any group of creditors from participating in a recovery on this stage of this proceeding.

█ Next, the directors contend that Wieboldt has failed to state a claim against the directors for breach of fiduciary duty to any party who may have incurred a loss as a result of the LBO. The directors assert that they did not owe a duty to the corporation at the time of the LBO, but rather owed a duty only to shareholders who were of record on or before December 19, 1985 (the date on which the directors resigned or were replaced). Because no such shareholder claims to have been injured by the buyout, the directors argue, Wieboldt has no claim.

The corporate law of the state of incorporation governs the fiduciary duty of a director to the corporation and its shareholders. *Treco, Inc. v. Land of Lincoln Savings & Loan*, 749 F.2d 374, 377 (7th Cir. 1984). Wieboldt is an Illinois corporation. Under Illinois law, a director must act with utmost good faith and loyalty in managing the corporation. *Wencordic Enterprises, Inc. v. Berenson*, 110 Ill.Dec. 730, 732, 511 N.E.2d 907, 158 Ill.App.3d 913 (1987); *Coduti v. Hellwig*, 82 Ill.Dec. 686, 469 N.E.2d 220, 127 Ill.App.3d 279 (1984); *Jaffe Commercial Finance Co. v. Harris*, 74 Ill.Dec. 722, 456 N.E.2d 224, 119 Ill.App.3d 136 (1983). They must exercise the degree of care that a reasonably prudent director of a similar corporation would use under the circumstances. *In re Illinois Valley Acceptance Corp.*, 531 F.Supp. 737, 740 (C.D. Ill.1982). However, Illinois law also provides for a "business judgment rule." Under the business judgment rule, directors who perform diligently and carefully and have not acted fraudulently, illegally or otherwise in bad faith will not be liable for honest errors or mistakes of judgment. *Treco*, 749 F.2d at 377.

The directors' assertion that they did not owe a duty to the corporation during the formulation and execution of the LBO is incorrect. A corporate board of directors has a fundamental duty to protect the corporate enterprise from "harm reasonably perceived, irrespective of its source." *Unocal Corp. v. Mesa Petroleum*, 493 A.2d 946, 954 (Del.Supr.1985).[29] When a board addresses a pending takeover bid, it must determine whether the offer is in the best

---

**28.** Section 510(c) provides that, after notice and a hearing, a court may

 (1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; ...

11 U.S.C. § 510(c).

**29.** Illinois courts have often looked to Delaware law for guidance in deciding previously undecided corporate law issues. *See, e.g., Treco,* 749 F.2d at 379; *Panter v. Marshall Field & Co.,* 646 F.2d 271, 293 (7th Cir.), *cert. denied* 454 U.S. 1092, 102 S.Ct. 658, 70 L.Ed.2d 631 (1981).

interests of the corporation and its shareholders. *Id.* A board's response to a takeover will be protected by the business judgment rule only if the board "acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Id.*

The directors cite *Revlon, Inc. v. MacAndrews & Forbes Holdings,* 506 A.2d 173 (Del.Supr.1986), for their insistence that their duty was to the shareholders alone and not to the corporation and its creditors. In *Revlon,* the Delaware Supreme Court held that where a corporation that is the target of competing takover bids is to be sold, its directors' duty becomes one of "maximization of the company's value at a sale for the stockholders' benefit" in order to "obtain the best price for the stockholders at a sale of the company." *Revlon,* 506 A.2d at 176. They assert that WSI's tender offer resulted in a sale of the company and therefore the directors' duty was merely to obtain the best price for the company's shareholders.

The Board's reliance on *Revlon* is misplaced. The fiduciary duties imposed by *Revlon* were not triggered by the WSI/Wieboldt takeover bid. "*Revlon* duties arise only where circumstances make it *inevitable* that the company will be sold to one of the bidders competing to acquire it." *Ivanhoe Partners v. Newmont Mining Corp.,* 533 A.2d 585, 603 (Del.Ch.), *aff'd* 535 A.2d 1334 (Del.Supr. 1987) (emphasis added). The complaint does not suggest that the Wieboldt Board at any time resolved to sell the company. WSI was not in a bidding war with a competing acquiror. In addressing the WSI takeover bid, therefore, the Board's affirmative duty was to determine whether the offer was in the best interests of the corporation as well as its shareholders.

■ Applying these principles to Wieboldt's complaint, it appears that Wieboldt

has stated a claim against the directors for breach of fiduciary duty. Although the directors may have adequately investigated the terms of the LBO and had anticipated the effect the LBO would have on the corporation (Complaint ¶¶ 74, 79, 81, 86, 89), the court can reasonably infer from the complaint that the directors did not act in good faith and in furtherance of the corporation's best interests. Four of the nine directors owned shares of Wieboldt stock before the tender offer and therefore would have personally received a direct benefit by approving the tender offer. (Complaint ¶¶ 26–31). The remaining directors were affiliated with one of Wieboldt's two controlling shareholders, Mr. Schottenstein and his affiliates or MBT Corporation and the Trump brothers. (Complaint ¶¶ 23, 24). In addition, the directors approved the tender offer notwithstanding their concurrent knowledge the Wieboldt was insolvent. (Complaint ¶¶ 75–78, 87). The court can reasonably infer from these facts that the directors acted in their own interests in approving the tender offer notwithstanding the fact that the LBO would result in harm to the corporation.

The complaint alleges sufficient facts to support a cause of action against the directors for breach of their fiduciary duty to the corporation. The directors' motions to dismiss Counts IX and X are denied.

### 5. *Illinois Business Corporation Act*

In Count XI, Wieboldt attempts to state a claim under Sections 8.65(a)(1) and 9.10(c)(1) of the Illinois Business Corporations Act of 1983 ("IBCA"), Ill.Rev.Stat. ch. 32, ¶¶ 8.65(a)(1) and 9.10(c)(1). Section 9.10(c)(1) prohibits a board of directors from authorizing a distribution to shareholders that would have the effect of rendering the corporation insolvent.[30] Section

---

**30.** Section 9.10 states, in pertinent part:
  § 9.10. Distributions to shareholders. (a) The board of directors of a corporation may authorize, and the corporation may make, distributions to its shareholders, subject to any restriction in the articles of incorporation and

subject also to the limitations of subsection (c) of this Section.
  . . . .
  (c) No distribution may be made if, after giving it effect:
  (1) the corporation would be insolvent; or

8.65(a)(1) provides that directors who assent to a distribution prohibited by Section 9.10 are jointly and severally liable to the corporation for the amount of the distribution.[31] Defendants assert that Wieboldt fails to state a claim against the directors for an illegal distribution to shareholders because (1) the directors did not assent to such distribution within the meaning of Section 8.65, and (2) Wieboldt did not make a distribution to shareholders within the meaning of Sections 8.65 and 9.10.

■ As an initial matter, Wieboldt has fairly alleged that the directors assented to the alleged distribution. The minutes from the November 18, 1985 Special Meeting of Wieboldt's Board of Directors indicate that the Board unanimously adopted a resolution on that date approving the WSI tender offer and merger and recommending it to the shareholders. (Complaint ¶ 91; Exhibit E). This vote constituted the directors' voluntary assent to the group of transactions which allegedly resulted in a pledge of Wieboldt assets in exchange for Wieboldt shares.

■ The directors' primary contention is that the exchange between HCFS and the shareholders was not an improper distribution. Both Wieboldt and the directors contend that legislative history controls the meaning of the term "distribution" as it is used in Section 9.10. Wieboldt maintains that the court must "collapse" this transaction and find that the Board made an illegal distribution because the effect of the payment of cash from HCFS to the shareholders was to transfer Wieboldt assets to Wieboldt shareholders. Wieboldt maintains that the Illinois statute encompasses such an indirect transfer. The directors assert

that the Illinois statute does not contemplate a transfer whereby no corporate assets pass directly from the corporation to its shareholders.

Neither Section 9.10 nor any other section of the IBCA defines the term "distribution" as it is used in the Act. However, the Revised Model Business Corporations Act ("MBCA"), from which the IBCA derives, defines "distribution" very broadly. Section 1.40(6) provides that the term "distribution" encompasses:

a direct or indirect transfer of money or other property (except [a corporation's] own shares) or incurrence of indebtedness by a corporation to or for the benefit of its shareholders in respect to any of its shares. A distribution may be in the form of a declaration or payment of a dividend; a purchase, redemption, or other acquisition of shares; a distribution of indebtedness; or otherwise.

Model Business Corporations Act Annotated, 1.40(6) at 73 (3d. ed. vol. 1). The Official Comment to Section 1.40(6) indicates that the definition is "intended to include any ... transaction in which the substance is clearly the same as a typical dividend or share repurchase, no matter how structured or labeled." *Id.* at 77.

Although the Illinois Legislature did not incorporate the MBCA's definition of "distribution" into the IBCA, the Legislature's failure to adopt this definition does not indicate an intention to restrict the section to a narrow category of direct transfers. The predecessor to the IBCA, the Business Corporations Act of 1933, contained three provisions which regulated the directors' power to distribute corporate assets to shareholders.[32] By enacting 9.10 for the

---

(2) the net assets of the corporation would be less than zero or less than the maximum amount payable at the time of distribution to shareholders having preferential rights in liquidation if the corporation were then to be liquidated.

Ill.Rev.Stat. ch. 32, ¶ 9.10 (1983).

**31.** Section 8.65 provides, in pertinent part:

§ 8.65. Liability of directors in certain cases. (a) In addition to any other liabilities imposed by law upon directors of a corporation, they are liable as follows:

(1) The directors of a corporation who vote for or assent to any distribution prohibited by Section 9.10 of this Act shall be jointly and severally liable to the corporation for the amount of such distribution.

Ill.Rev.Stat. ch. 32, § 8.65(a)(1) (1983).

**32.** Section 6 provided that a corporation "shall not purchase, either directly or indirectly, its own shares when its net assets are less than [its stated capital and paid-in surplus]." Ill.Rev. Stat. ch. 32, § 157.6 (1933). Section 41 prohibited a board of directors from declaring a dividend when the corporation is insolvent or

express purpose of superceding the prior act, the Illinois Legislature adopted a more general description of prohibited corporate distributions. In the absence of contrary authority, it appears likely that the Illinois Legislature contemplated a broad range of transfers, including indirect transfers such as the exchange of cash and shares between HCFS and the shareholders. The directors' motions to dismiss Count XI therefore are denied.

## D. RULE 19 MOTIONS TO DISMISS

Certain of the defendants urge the court to dismiss the complaint under Fed.R.Civ.P. 12(b)(7) on the grounds that Wieboldt has failed to join parties who are necessary for just adjudication under Fed.R.Civ.P. 19.[33] These defendants argue that Wieboldt's complaint must fail in the absence of (1) all those persons who held and tendered fewer than 1,000 shares during the tender offer ("Absent Shareholders"), and (2) WSI Sub, Inc., WSI Acquisition Corp., and their principals ("WSI Parties").

■ The Absent Shareholders are not necessary parties to this action. This opinion dismisses the complaint against the Schedule A shareholders because they did not receive Wieboldt's property during the LBO transactions and therefore cannot be liable as a transferee of fraudulently conveyed property. *See* Section III.C.2. of this opinion. The court's reasoning applies equally well to the Absent Shareholders. Wieboldt does not allege in its complaint that the Absent Shareholders were aware of the insider and controlling shareholders' and LBO Lenders' alleged scheme to defraud Wieboldt's creditors. Like the Schedule A shareholders, the Absent Shareholders participated in the scheme only to the extent that they exchanged their shares for funds from WSI. The Absent Shareholders are not necessary parties to this litigation.

■ Nor are the WSI Parties necessary to a just adjudication of this dispute. The absence of the WSI Parties does not create the possibility that defendants will incur inconsistent obligations because the WSI parties could not obtain the relief that Wieboldt requests in its complaint from these defendants in a subsequent lawsuit. Counts I through VII of Wieboldt's complaint request a judgment avoiding the transfer of Wieboldt assets to the shareholders or LBO Lenders. Only a trustee in bankruptcy or debtor-in-possession can request relief under the fraudulent conveyance provisions in the Bankruptcy Code. *See* 11 U.S.C. ¶¶ 548(a), 1107(a). The remaining counts in the complaint request a judgment from the directors for compensatory and punitive damages and the amount of the HCFS financing commitment. As this court has previously discussed, equity precludes WSI, as Wieboldt's new majority shareholder, from bringing an action against Wieboldt's former managers for mismanagement and breach of their fiduciary duty. *See* Section III.C.4. of this opinion. Defendants therefore will not incur inconsistent obligations to WSI in a subsequent lawsuit; their joinder is not necessary to a just adjudication of this action.

Defendants' Rule 19 motion to dismiss is denied.

---

would be rendered insolvent by payment of the dividend. Ill.Rev.Stat. ch. 32, § 157.41 (1933). Section 41(a) permitted a corporation, under certain circumstances, to distribute a portion of its assets to its shareholders as a partial liquidating dividend, but prohibited such dividends when the corporation was insolvent. Ill.Rev. Stat. ch. 32, § 157.41(a) (1933).

**33.** Fed.R.Civ.P. 19(a) states, in part:
  (a) Persons to be joined if feasible. A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action

if (1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest. If the person has not been so joined, the court shall order that the person be made a party.

## IV. CONCLUSION

The Schedule A shareholder defendants' motions to dismiss Count VIII against them are GRANTED. The other defendants' motions to dismiss the remaining counts of the complaint are DENIED.