**In Re C–T OF VIRGINIA, INC., f/k/a Craddock–Terry Shoe Corporation, Debtor.**

**C–T OF VIRGINIA, INC., f/k/a Craddock–Terry Shoe Corporation, Plaintiff,**

v.

**James S. BARRETT, II, et al., Defendants.**

**Civ. A. No. 90–0024–L.**

**No. 687–01155–WA1.**

United States District Court, W.D. Virginia, Lynchburg Division.

Nov. 27, 1990.

 

Edward B. Lowry, Charlottesville, Va., Harold Bonacquist, Traub, Bonacquist, Yellen & Fox, New York City, for plaintiff.

William Tracey Shaw, Lynchburg, Va., Benjamin C. Ackerly, Hunton & Williams, Richmond, Va., for defendants.

## MEMORANDUM OPINION

KISER, District Judge.

This matter is before the Court on defendants' motion for summary judgment and plaintiff's cross-motion for partial summary judgment. This case was brought by the Official Committee of Unsecured Creditors of C–T of Virginia, Inc. ("C–T"), formerly Craddock–Terry Shoe Corporation on behalf of C–T of Virginia against certain former officers and directors of Craddock–Terry. The suit arises out of a statutory merger approved by Craddock–Terry directors in January 1986 and consummated in April 1986. The background of this merger is as follows:

In April 1985, C–T hired Prudential–Bache Securities, Inc. ("Prudential"), as financial advisor to study strategic financial alternatives available to C–T. One of Prudential's recommendations was that C–T pursue a leveraged buyout. The Board decided that a management buyout would most likely realize maximum value for shareholders because it (i) would provide the highest expected value to shareholders and had a high probability of success, (ii) would maintain the viability of the enterprise, and (iii) would protect the interests of employees and other constituents. The Board authorized management to explore a buyout at a price of $15 per share.

On June 12, 1985, after an announcement of a proposed LBO by management, C–T received an unsolicited proposal from Southwestern General Corporation proposing a merger under which holders of C–T would receive $17.50 per share. Southwestern withdrew its offer on August 26, 1985, following an announcement by President Reagan that he would not limit the importation of shoes into the United States.

On November 11, 1985, HH Holdings, Inc., a Delaware holding company owned by Sidney Kimmel and Alan Salke, made an unsolicited offer for a cash merger in which each share of C–T common stock would be exchanged for $19.00 cash. On November 25, 1985, HH Holdings increased its offer to $20.00 cash per share of C–T common stock. An Agreement in Principle was signed on December 11, 1985, and an Agreement and Plan of Merger ("Merger Agreement") was executed on January 24, 1986, between C–T, HH Holdings and HH Acquisition, Inc., a wholly-owned subsidiary of HH Holdings formed for the purpose of completing the proposed merger. The Merger Agreement provided that on April 30, 1986, HH Acquisition would merge into C–T, with C–T as the surviving corporation owned by HH Holdings. Of the approximately $30 million needed to repurchase all outstanding shares of C–T, all but $4 million would be obtained from banks by loans secured by C–T's property. On April 30, 1986, the buyout was consummated. The former directors of C–T, defendants in this case, resigned on that date.

After the buyout, C–T was unable to maintain a strong financial position. Affidavits conflict as to whether C–T was unable to pay its bills on a timely basis immediately after the merger, but before long C–T sunk into insolvency. C–T filed for bankruptcy on October 21, 1987.

C–T originally filed suit against both directors and officers, charging both groups with violations of fiduciary duties, and the directors with liability for approving a distribution in violation of Va.Code §§ 13.1–653 and –692. I granted defendants' motions for dismissal of the breach of fiduciary claims, finding that management's sole fiduciary duty was to shareholders, not to creditors of the corporation. C–T, Inc. v. Barrett, et al., Case No. 90–24–L, Order and Memorandum Opinion of August 10, 1990. The cases against non-director officers were dismissed. However, I denied dismissal of the unlawful distribution count, finding that some possible set of facts could demonstrate that the merger transaction was a distribution for which directors are liable.

Defendants now contend that the facts developed through discovery conclusively prove that the merger transaction was not a distribution authorized by the defendant directors. C–T argues that the facts demonstrate that there was a distribution, and that it made C–T insolvent. Both parties seek summary judgment on the question of whether a distribution occurred.

*Motion for Summary Judgment*

*Was there a Distribution?*

■ Directors may be held liable for an unlawful distribution only if the transactions that occurred fit within the statutory definition of a distribution. Inquiry must begin from the statutory definition of distribution, Va.Code § 13.1–603:

"Distribution" means a direct or indirect transfer of money or other property, except its own shares, or incurrence of indebtedness by a corporation to or for the benefit of its shareholders in respect of any of its shares. A distribution may be in the form of a declaration or payment of a dividend; a purchase, redemption, or other acquisition of shares; a distribution of indebtedness; or otherwise.

C–T argues that the open-ended language of the definition of distribution means that whenever a board of directors approves a transaction that causes shareholders to receive money and implicates the assets of the corporation in any way, they have approved a distribution. C–T's counsel conceded at oral argument that this interpretation makes every merger a distribution (although not necessarily an unlawful one).

■ I find this interpretation of Va.Code § 13.1–603 to be inconsistent with Virginia's statutory scheme. Virginia provides different statutory frameworks for different corporate transactions. Distributions are governed by Va.Code § 13.1–653. Mergers and share exchanges are governed by Article 12 of the Corporate Code, Va. Code § 13.1–716 *et seq.*, statutes which makes no mention of distributions. C–T does not allege that the defendants failed to comply with the provisions of this statute. By contrast, corporate sales of assets

are governed by Va.Code § 13.1–724, which recognizes that some sales of assets may constitute distributions, and mandates compliance with the distribution statute. Va. Code § 13.1–724.G. If the legislature had intended directors reviewing merger proposals to consider whether a distribution was occurring, it could have provided parallel language in the merger statute. A director who wished to determine his duties in connection with a statutory merger would have no reason to believe that the distribution statute was relevant.

Even if not all mergers are not distributions, the C–T merger might still have been a disguised merger. For example, if the defendants actually controlled HH Holdings, and planned to use their powers on the boards of both companies to require C–T to repay HH Holdings for the costs of the stock purchases, they would be approving a distribution clothed in the garb of a merger. *See Wieboldt Stores, Inc. v. Schottenstein*, 94 B.R. 488 (N.D.Ill.1988). In my earlier decision, I left open to C–T the opportunity to prove that the transaction that occurred was not intended to merge two companies, but instead to distribute the firm's assets to shareholders.

C–T offers several pieces of evidence. First, the proxy statement released to shareholders at the time of the merger stressed that the Board had been seeking the highest price for the company. It also stated that stockholders' sales of stock would be taxable for federal income tax purposes. However, these board statements are consistent with an intent to authorize the sale of the company, as well as an intent to distribute the company's assets.

C–T also draws attention to the fact that both HH Holdings and HH acquisitions were not operating companies before the merger, but were formed solely to purchase C–T. However, these firms were created by Sidney Kimmel and Alan Salke, who were not members of the Board of Directors of C–T at the time and were not in any way connected to it. C–T's implicit argument, that the directors created the shell companies by operating through the

instrumentalities of Kimmel and Salke to mask a distribution, is unsupported by the actual course of events.

Finally, Robert Buford, C–T's counsel at the time the merger was approved asserted at a deposition that the form of the merger was decided by HH, and that the defendants' only concern was the amount of money that the shareholders would receive. I find this insufficient to prove an intent to create a distribution. It is well-established in corporate law that when the sale of a firm is inevitable, the directors' duty is to obtain the highest price for shareholders. *See Revlon v. MacAndrews & Forbes Holdings*, 506 A.2d 173 (Del.1986). The directors' statement was consistent with their fiduciary duties in the context of a buyout, and should not be inconsistent with their duties in the distribution context.

All available evidence suggests that the directors expected the company to continue operating after the buyout, and presumed that their replacements would make proper distributions and payments to creditors in connection with their own fiduciary duties. Indeed, the purchasers did install a new board of directors, attempted to develop new product lines, and operated the firm for nearly two years prior to bankruptcy. The subsequent failure of the firm is more plausibly attributed to the new directors and the continuing decline of the domestic shoe industry than to the directors' authorization of the buyout.

*Did directors authorize the actions?*

Even if the transaction were a distribution, the defendants would not be liable. The distribution was not authorized by the defendants, but by the new board of directors that replaced them after the merger. Members of a corporation's board may be held liable only for distributions that they "vote for or assent to." Va.Code § 13.1–692.

C–T does not claim that the purchase of shares by HH Acquisitions constituted the unlawful distribution. The purchase was not a transfer of C–T assets to its shareholders, but a transfer of HH Acquisition's assets to C–T.'s shareholders. Rather, the purported distribution was the encumber-

ing of C–T's assets to the secured lenders who financed the buyout.

The defendants assert they cannot be held liable for that encumbrancing because those debts were approved by the new board of directors after the defendants resigned. C–T lists a variety of ways that the defendants cooperated with the buyers to facilitate the secured loans. The CEO of C–T (who is a defendant) agreed to provide HH Holdings and HH Holdings' banks with the company's financial plan, an appraisal of the company's real estate, and other financial information. Senior management met with auditors on at least two occasions. The board of directors also approved the repurchase of the company's preferred stock, a step necessary before the merger could be effective. Taken as a whole, these steps demonstrate that the defendants were or should have been aware that the assets of C–T would be encumbered after the buyout was completed.

The gist of the argument is that the merger, and the encumbrancing, would not have occurred if the defendants had not cooperated. Assuming this to be the case, it does not demonstrate that the outgoing directors may be held liable for the later events. C–T cites a very few cases where courts have "collapsed" the transactions associated with a buyout to hold former directors responsible for later actions. The facts here do not justify taking such an extreme step.

C–T's principal authority is *Wieboldt Stores, Inc. v. Schottenstein, supra.* In that case, the district denied a motion for dismissal of claims by a bankruptcy trustee against the board of directors that approved a leveraged buyout.[1] That complaint, however, involved far more egregious circumstances than the evidence supports here. That complaint urged the court to "collapse" the several transactions in the LBO and treat it as a single transaction so that the assets of the debtor corporation were distributed directly to the shareholders. In considering this approach

the court stated that it must find "that WSI [the purchaser] and any other parties were mere conduits" of the debtor's property. 94 B.R. at 500. The court found that the allegations in the complaint justified collapsing the transaction because

> The Board and the insider shareholders knew that Wieboldt was insolvent before the LBO and that the LBO would result in further encumbrance of Wieboldt's already encumbered assets. Attorneys for Schottenstein Stores apprised the Board of the fraudulent conveyance laws and suggested that they structure the LBO so as to avoid liability. Nonetheless, these shareholders recommended that Wieboldt accept the tender offer and themselves tendered their shares.

94 B.R. at 502. By contrast, C–T does not allege that it was insolvent before the buyout. C–T alleges only that the encumbrancing of C–T's assets at the time of the merger rendered it equitably insolvent. It is clear from the record that the buyers of C–T invested $4 million in new capital at the time they purchased the firm. The commitment of $4 million cash suggests that this was not a sham transaction where HH Acquisitions was a "mere conduit" of C–T's property to its shareholders but that the new owners were financially capable and willing to infuse additional funds as they became needed.

The best-known case where a series of transactions were "collapsed" is *United States v. Gleneagles Investment Co.,* 565 F.Supp. 556 (M.D.Pa.1983), *aff'd sub nom. United States v. Tabor Court Realty Corp.,* 803 F.2d 1288 (3d Cir.1986), *cert. denied,* 483 U.S. 1005, 107 S.Ct. 3229, 97 L.Ed.2d 735 (1987). That case involved actual as well as constructive fraud. Further, although the court asserted that one of the payments to shareholders was an unlawful distribution, it held the shareholders and not the director liable; the director's role is important only because "he was put in the position to make the distribution by the [controlling shareholders] as

---

1. The action against the board of directors survived a motion for dismissal in this case as well. The *Wieboldt* court did not consider the case on the expanded record available at summary judgment.

part of the whole transaction." *Gleneagles* collapses transactions related to a leveraged buyout in order to hold the purchasing firm, lenders, and outgoing shareholders liable to creditors on several different theories, but it does not justify holding directors liable.

Finally, C–T relies on *Corporate Jet Aviation,* 45 B.R. 629 (Bankr.N.D.Ga.1985), *aff'd,* 82 B.R. 619 (N.D.Ga.1987), *aff'd,* 838 F.2d 1220 (11th Cir.1988) for the proposition that "a director can be held liable for contracts executed after his resignation, if that were the consequence of actions taken by him before his resignation." Plaintiff's memorandum opposing summary judgment at 19. *Corporate Jet Aviation* involved a company with two shareholders, Brannen and Vantress, both of whom were directors. The challenged transaction was a stock redemption by the company of Vantress' shares, a few days after he had resigned from the board. The firm alleged that Vantress had breached his continuing fiduciary duty to the company by accepting an unreasonably high redemption value for his shares, even though he had resigned. The court's finding of responsibility was based on the fact that Vantress personally received unjust enrichment. This precedent does not extend to C–T, where the complaint alleges breach of the defendants' duties as directors, not unjust enrichment as shareholders.[2] It does not suggest that an individual may be held responsible for a distribution from which he did not personally profit.

 C–T suggests that even where a board does not directly cause a distribution, it may be liable if its participation in a transfer of assets to shareholders reaches the level of "aiding and abetting," a term well-defined by the criminal law. Again, the structure of the Virginia Corporation Act makes this interpretation implausible. Va.Code § 13.1–692 envisions holding directors liable only for official actions taken in their capacity as members of the board. Thus, only board members can be liable for

a distribution because only board members can authorize one. Va.Code § 13.1–692. There are many ways that a non-director could assist in the creation of an unlawful distribution. If Virginia had intended to make abettors liable under this statute, it would not have limited liability to directors.

*Conclusion*

The defendants' liability for a distribution must depend entirely on their pre-merger actions. Because the uncontradicted evidence demonstrates that the directors intended to transfer ownership of C–T as a going enterprise and were not seeking to hide a distribution of the firm's assets to the shareholders, no unlawful distribution occurred. Further, to the extent the events associated with the buyout may be considered a distribution, the defendants were no longer directors at the time it was approved by the board, so they cannot be held liable.

The Clerk is directed to send a certified copy of this Memorandum Opinion to all counsel of record, and to Bankruptcy Judge William E. Anderson.

### ORDER

On November 5, 1990, came the parties on defendant's Motion for Summary Judgment. For reasons explained in the accompanying memorandum opinion, it is hereby ADJUDGED and ORDERED:

(1) Plaintiff's Motion for Partial Summary Judgment is hereby DENIED.

(2) Defendant's Motion for Summary Judgment is hereby GRANTED.

(3) Plaintiff's Motion to Recuse Defense Counsel is hereby DISMISSED AS MOOT.

The Clerk is directed to send a certified copy of this order to all counsel of record and to Bankruptcy Judge William E. Anderson, and to strike this case from the active docket of this Court.

---

**2.** Several of the directors are also defendants in a separate action, alleging that they (and other shareholders) were unjustly enriched by a

fraudulent conveyance of their stock in the buyout. C–T, Inc. v. EuroShoe, Inc., et al., 90–43–L.