958 F.2d 606
 In re C-T OF VIRGINIA, INCORPORATED, formerly known as
Craddock-Terry Shoe Corporation, Debtor.
C-T OF VIRGINIA, INCORPORATED, formerly known as
Craddock-Terry Shoe Corporation, Plaintiff-Appellant,
v.
James S. BARRETT, II; Michael J. Gade; Lewis B. Goode,
Jr.; W. Edwin Masencup, Jr.; G. Bruce Miller;
Kenneth S. White; Alan L. Wurtzel,
Defendants-Appellees,
and
Edward F. Haley, III; Roland H. Newman; Roland K. Peters;
Elias Richards, III; F. Edward Thomas, Defendants.
 No. 90-1556.
 United States Court of Appeals,
Fourth Circuit.
 Argued Oct. 28, 1991.
Decided March 5, 1992.
 
 Edward B. Lowry, Michie, Hamlett, Lowry, Rasmussen & Tweel, P.C., Charlottesville, Va., argued (Harold F. Bonacquist and Paul Traub, Traub, Bonacquist, Yellen & Fox, New York City, on brief), for plaintiff-appellant.
 Virginia W. Powell, Hunton & Williams, Richmond, Va., argued (Tyler P. Brown, Benjamin C. Ackerly, Sr., Hunton & Williams, Richmond, Va. and William T. Shaw, Edmunds & Williams, Lynchburg, Va., on brief), for defendants-appellees.
 Before HALL and WILKINSON, Circuit Judges, and YOUNG, Senior United States District Judge for the District of Maryland, sitting by designation.
 OPINION
 WILKINSON, Circuit Judge:
 
 
 1
 This case presents the question of whether the leveraged acquisition of a corporation, structured in the form of a cash-out merger and consummated at arm's length, is subject to restrictions on distributions to shareholders under Virginia law. The case involves an action brought by an official committee of unsecured creditors of a corporation now in bankruptcy against the former directors of that corporation. The creditors, suing on behalf of the corporation, claimed that the leveraged acquisition created an illegal distribution to shareholders under the Virginia Stock Corporation Act, Va.Code Ann. § 13.1-601 et seq. (Michie 1989). We agree with the district court that the merger did not create a distribution under Virginia law and therefore affirm its judgment.
 
 I.
 
 2
 The facts underlying this case are not in dispute. C-T of Virginia, Inc., formerly Craddock-Terry Shoe Corp., is a Virginia corporation engaged in the manufacture, wholesale, and mail-order sale of shoes. Prior to the purchase that is the subject of this action, C-T was a publicly owned corporation whose stock was traded on the over-the-counter market. In April 1985, C-T hired a financial adviser, Prudential-Bache Securities, Inc., to study the strategic alternatives available to the company. Prudential recommended that C-T's management pursue a leveraged buyout ("LBO") of the company. Prudential indicated that an LBO would both realize maximum value for C-T's shareholders and maintain the viability of the post-LBO enterprise.
 
 
 3
 On May 20, 1985, C-T's board of directors accepted Prudential's recommendation and authorized management to explore the possibility of a management-sponsored LBO at $15 per share. (C-T common stock was trading for $14.25 per share when this authorization was announced.) The board retained the right to consider other proposals made to the corporation. On June 12, 1985, Southwestern General Corp. made such an unsolicited offer, which proposed a merger at $17.50 per share. Southwestern withdrew this offer on August 26, 1985, however, after President Reagan refused to impose limitations on shoe imports.
 
 
 4
 C-T received a second unsolicited offer on November 11, 1985, from HH Holdings, Inc. Holdings is a Delaware holding company owned by Sidney Kimmel and Alan Salke. Neither Holdings, Kimmel, nor Salke had any prior relationship or contact with C-T or the members of its board of directors. Holdings proposed a cash merger in which C-T shareholders would receive $19 per share of common stock. After the directors announced this offer, several owners of substantial amounts of C-T common stock urged that the directors reject the offer and demand $20 per share instead. Holdings agreed to the merger at $20 per share, and an Agreement in Principle was signed on December 11, 1985.
 
 
 5
 The parties formalized the transaction in an Agreement and Plan of Merger executed on January 24, 1986. The merger agreement structured the purchase in the form of a reverse triangular merger. For purposes of the merger, Holdings formed HH Acquisition, Inc., a wholly owned subsidiary. The merger agreement provided that on April 30, 1986, Acquisition would merge into C-T, leaving C-T as the surviving corporation wholly owned by Holdings. The funds necessary to purchase all outstanding shares of C-T, about $30 million, would be deposited with the exchange agent, Sovran Bank, before or at the closing of the transaction. At the moment that the merger was effected, the outstanding shares of C-T common stock would be automatically canceled, and the former shareholders would receive the right to submit their canceled stock certificates to Sovran for payment of $20 per canceled share. Also at that time, the directors of C-T would resign and be replaced by Salke, John W. Baker, and Roland K. Peters.
 
 
 6
 The financing for the merger was arranged solely by Holdings. Holdings provided about $4 million of its own money. It obtained the balance, approximately $26 million, in the form of bank loans secured by C-T's assets. The pre-merger directors did not solicit proposed financing, negotiate the terms of the financing or of the security, or participate in or authorize the encumbering of C-T's assets. The merger agreement did obligate C-T to provide Holdings, Acquisition, and the financing banks access to C-T's properties, personnel, and books and records and to cooperate with Holdings' efforts to secure financing. Further, the pre-merger directors approved the repurchase of C-T's preferred stock, which was a prerequisite to effectuation of the merger.
 
 
 7
 C-T's board of directors approved the merger agreement and unanimously voted to recommend that the shareholders approve the merger, which they did on April 17, 1986. The transaction was consummated as planned on April 30. The surviving corporation struggled along for about eighteen months, and it filed for bankruptcy under Chapter 11 on October 21, 1987.
 
 
 8
 In October 1989, the Official Committee of Unsecured Creditors of C-T filed this action in federal court against the pre-merger directors and officers of the corporation. The complaint alleged that the directors and officers breached their fiduciary duties owed to the corporation and that the directors had approved a distribution in violation of Va.Code Ann. §§ 13.1-653 and 13.1-692 (Michie 1989). The district court granted the defendants' motion to dismiss the former claim. 124 B.R. 689, 692-93 (W.D.Va.1990). It denied the directors' motion to dismiss the unlawful distribution claim, however, finding that under some factual circumstances the merger might have been a distribution. Id. at 693-94.
 
 
 9
 Subsequently, the district court granted the directors' motion for summary judgment on the illegal distribution claim. 124 B.R. 694 (W.D.Va.1990). The court found application of the restriction on distributions "inconsistent with Virginia's statutory scheme," because the merger provisions of the Virginia Stock Corporation Act--unlike the sale of corporate assets provisions, see Va.Code Ann. § 13.1-724 (Michie 1989)--"make[ ] no mention of distributions." 124 B.R. at 696-97. The court also concluded that the transaction was not "a distribution clothed in the garb of a merger" to evade the distribution restrictions. Id. at 697. The court concluded, finally, that, even if the merger involved a distribution, the directors did not "vote[ ] for or assent[ ] to" it, a prerequisite to liability under Va.Code Ann. § 13.1-692(A) (Michie 1989). For the latter holding, the court relied on the fact that the directors did not authorize the encumbering of C-T's assets, which occurred after they had resigned their offices. 124 B.R. at 699.
 
 
 10
 C-T appeals the summary judgment against it on the distribution claim.
 
 II.
 
 11
 Modern distribution statutes derive from eighteenth century restrictions on when a corporation could pay dividends to its shareholders. See Revised Model Business Corporation Act § 6.40 historical note 1 (1986) (hereinafter RMBCA). Restrictions on a corporation's purchase of its own shares, and on other forms of distributions, were enacted later. See J. Choper, J. Coffee, & C. Morris, Cases and Materials on Corporations 1007 (3d ed. 1989). All states now impose limitations on the power of a corporation to make various distributions to its shareholders, see RMBCA § 6.40 statutory comparison 1, and federal courts must, of course, pay strict attention to the language of the relevant state statute.
 
 
 12
 Virginia's corporate law statute, including the distribution provisions, was substantially revised in 1985. See 1985 Va. Acts 868 (codified at Va.Code Ann. §§ 13.1-601 to -800 (Michie 1989)). The Virginia statute defines "distribution" as follows:
 
 
 13
 "Distribution" means a direct or indirect transfer of money or other property, except its own shares, or incurrence of indebtedness by a corporation to or for the benefit of its shareholders in respect of any of its shares. A distribution may be in the form of a declaration or payment of a dividend; a purchase, redemption, or other acquisition of shares; a distribution of indebtedness of the corporation; or otherwise.
 
 
 14
 Va.Code Ann. § 13.1-603 (Michie 1989). Not all distributions are unlawful. Rather, a distribution is prohibited only if, after it is made, the corporation fails either of two insolvency tests:
 
 
 15
 No distribution may be made if, after giving it effect:
 
 
 16
 1. The corporation would not be able to pay its debts as they become due in the usual course of business; or
 
 
 17
 2. The corporation's total assets would be less than the sum of its total liabilities plus (unless the articles of incorporation permit otherwise) the amount that would be needed, if the corporation were to be dissolved at the time of the distribution, to satisfy the preferential rights upon dissolution of shareholders whose preferential rights are superior to those receiving the distribution.
 
 
 18
 Id. § 13.1-653(C).
 
 
 19
 Directors face potential personal liability when the corporation makes an unlawful distribution:
 
 
 20
 Unless he complies with the applicable standards of conduct described in § 13.1-690,[1] a director who votes for or assents to a distribution made in violation of this chapter or the articles of incorporation is personally liable to the corporation and its creditors for the amount of the distribution that exceeds what could have been distributed without violating this chapter or the articles of incorporation.
 
 
 21
 Id. § 13.1-692(A). There is, however, no provision in the Virginia Stock Corporation Act by which creditors can recover a distribution from the shareholders directly. Rather, a creditor's only remedy is against the directors, who then may seek contribution from shareholders who received the distribution. Id. § 13.1-692(B)(2).
 
 III.
 
 22
 We now address the central question in this case: whether the merger involved a distribution to shareholders within the meaning of § 13.1-603. For the reasons set forth below, we conclude that the transaction does not fall within the statutory definition of distribution and, therefore, that the directors cannot be subjected to potential liability under § 13.1-692.[2]
 
 A.
 
 23
 Appellant argues that the plain meaning of the statute contradicts the district court's conclusion that the merger did not create a distribution under Virginia law. It claims that the purchase of the premerger shareholders' shares in C-T entailed a distribution because the payment of the purchase price of $20 per share was a "transfer of money ... by a corporation to ... its shareholders." Since this purchase was funded primarily through loans secured by the assets of C-T, the argument runs, the value of the corporation--and hence the financial position of its creditors--was diminished. According to appellant, it is irrelevant whether the funds that are transferred to shareholders derive from the corporation's capital surplus, retained earnings, or new loans secured by corporate assets, and it is likewise immaterial that the payment resulted from a cash-out merger; appellant claims that the legislature intended the statute to have "the broadest range of inclusion" and thereby "pick up all forms of transfer of the assets of a corporation to its shareholders."
 
 
 24
 We do not share appellant's view of the statute. The Virginia Stock Corporation Act provides a precise definition of the word "distribution": "[A] direct or indirect transfer of money or other property, except its own shares, or incurrence of indebtedness by a corporation to or for the benefit of its shareholders in respect of any of its shares." Va.Code Ann. § 13.1-603 (Michie 1989). Payment of the merger consideration to C-T's former shareholders simply does not fit within the plain language of this definition. The key language, for our purposes here, is the requirement that the transfer of money or property be "by a corporation to ... its shareholders." When post-merger C-T transferred $20 per canceled share to C-T's pre-merger shareholders, they were no longer the corporation's--"its"--shareholders, for their ownership interest had been lawfully canceled as of the effective time of the merger.
 
 
 25
 Similarly, we must reject appellant's argument that the encumbering of C-T's assets to raise sufficient funds to pay for the merger was a distribution because it represented the "incurrence of indebtedness by a corporation ... for the benefit of its shareholders." Id. The financing for the merger was negotiated not by C-T's pre-merger directors for the benefit of C-T's pre-merger shareholders, but by the new owners and directors of the corporation. Moreover, the financing closed simultaneously with the closing of the merger. Accordingly, at the time the encumbering was undertaken, the pre-merger shareholders' ownership interests were canceled and, therefore, C-T did not incur debt "for the benefit of its shareholders."
 
 
 26
 Appellant's attempt to shoehorn the payment of merger consideration into the statutory definition of distribution must thus prove unsuccessful, for its argument fails to appreciate the significance of the fact that the transaction at issue represented the arm's-length purchase of C-T by Holdings. The distribution statute is aimed by its terms at actions taken by a corporation to enrich unjustly its own shareholders at the expense of creditors and to the detriment of the continuing viability of the company. It does not cover third-party payments to acquire the stock of a corporation or the encumbering of assets after a change in corporate ownership, and it is not intended to obstruct an arm's-length acquisition of an enterprise by new owners who have their own plans for commercial success. The reason for this distinction is simple: A corporate acquisition, structured as a merger, is simply a different animal from a distribution. Distribution statutes, as noted above, derive from the regulation of corporate dividends and traditionally apply to situations in which shareholders, after receiving the transfer from the corporation, retain their status as owners of the corporation. Distribution statutes have not been applied to wholesale changes in corporate ownership, as is the case here, and C-T has presented no evidence that the Virginia legislature intended the statutory definition to expand the applicability of distribution restrictions beyond their traditional scope.
 
 
 27
 Appellant insists, however, that the text of the statute does not exclude from the definition of distribution transfers incident to changes in corporate control. Appellant relies on the fact that § 13.1-603 states that "[a] distribution may be in the form of ... a purchase, redemption, or other acquisition of shares." This language, however, is not nearly as broad as C-T suggests. To begin with, it is subject to the general requirement that the corporation act for the benefit of its shareholders. Further, the language functions in this context to prevent a corporation from disguising a distribution in the form of a partial acquisition of shares--e.g., by "purchasing" twenty-five percent of each shareholder's shares, which would have the effect of transferring corporate assets to the shareholders without the corporation receiving any consideration in exchange and without changing the ownership structure in the slightest. The inclusion of purchases, redemptions, and other acquisitions within the ambit of distributions, therefore, is not an indication that the statutory definition applies when all outstanding shares of the corporation are purchased at a market rate in the course of an arm's-length purchase of the corporation.
 
 
 28
 None of this discussion should suggest that the transaction in this case was not subject to extensive regulation. Article 12 of the Virginia Stock Corporation Act provides detailed procedures that govern mergers, see Va.Code Ann. §§ 13.1-716, -718 (Michie 1989), and mandates review of the articles of merger by the Virginia State Corporation Commission, see id. § 13.1-720(B). As the district court observed, Article 12 "makes no mention of distributions," and the Virginia legislature could easily have provided a cross-reference to the distribution statutes had it intended the latter to apply to mergers. 124 B.R. at 696-97. Further, Virginia law prohibits transfers of money or corporate shares that are made "with intent to delay, hinder or defraud creditors," Va.Code Ann. § 55-80 (Michie 1986), or that are "not upon consideration deemed valuable in law," id. § 55-81 (Michie Supp.1991). Finally, federal bankruptcy law provides that a trustee in bankruptcy may avoid any transfer made within one year before bankruptcy, if the debtor "received less than a reasonably equivalent value in exchange" and was insolvent at the time of, or became insolvent as a result of, the transfer. 11 U.S.C.A. § 548(a)(2)(A) and (B)(i) (West Supp.1991). The existence of other state and federal enactments that potentially address this kind of transaction suggests the inadvisability of importing the distribution statutes into a context that the legislature did not intend.
 
 B.
 
 29
 Other reasons impel us to hold that the leveraged acquisition of C-T was not a distribution under Virginia law. In this case appellant asks a federal court to apply a state distribution statute in a wholly novel way. It has not directed our attention to any decision by any court, state or federal, that has applied distribution restrictions to an arm's-length merger. "Federal judges are disinclined to make bold departures in areas of law that we have no responsibility for developing." Afram Export Corp. v. Metallurgiki Halyps, S.A., 772 F.2d 1358, 1370 (7th Cir.1985). Moreover, the reach of the rule of law appellant seeks is extremely broad: appellant conceded to the district court that, under its interpretation of the statutory definition, every merger would henceforth be a distribution. See 124 B.R. at 696. Accepting appellant's argument, therefore, would expose the defendants and directors of other Virginia corporations to a wholly unanticipated form of personal liability and would place a cloud over all corporate acquisitions that have closed within the past two years, see Va.Code Ann. § 13.1-692(C) (Michie 1989) (two-year statute of limitations for actions alleging personal liability for illegal distributions).
 
 
 30
 More fundamentally, application of distribution restrictions in the context of changes in corporate control would place directors under conflicting legal duties. In this case, for example, the district court found that, after the announcement that the directors had authorized a management-sponsored LBO, the company was for sale. 124 B.R. at 692 (relying on In re Time, Inc., Shareholder Litig., 571 A.2d 1140 (Del.1989.)) Thus, under Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc., 506 A.2d 173 (Del.1986), the fiduciary duties owed by the pre-merger directors to C-T's shareholders required that the directors "sell [the company] to the highest bidder," id. at 182, and seek the highest price possible from that bidder. By negotiating with Holdings and getting Holdings to increase its offer price from $19 to $20, C-T's pre-merger directors were simply fulfilling these well-recognized fiduciary duties. Indeed, had the directors refused to consummate the transaction because Holdings planned to acquire the bulk of the merger consideration by leveraging the company's assets, C-T's shareholders would likely have sued them for breach of fiduciary duty. If we accepted appellant's proffered interpretation of the definition of distribution, however, C-T's pre-merger directors would have been required not only to maximize the sale price, but also to ensure the solvency of the post-sale corporation. How directors could successfully navigate these narrow waters--subject to the possibility of massive personal liability should they falter on either side--is left unexplained.
 
 
 31
 Moreover, it is difficult for us to conceive how distribution restrictions would effectively function in the corporate acquisitions context. In determining whether a proposed distribution is legal, directors must apply two sophisticated insolvency tests. See Va.Code Ann. § 13.1-653(C) (Michie 1989). In applying these tests, directors must assess the future business prospects and decisions of the company. See RMBCA § 6.40 comment 2. When, after a distribution, directors continue to operate the company and set its business policy, such a task is manageable and within their competence. In cases involving corporate acquisitions, however, the pre-acquisition directors typically depart their positions in the corporation after the transaction. Not only do they therefore lack any control over the future course of the company's business, but they also may be fully unaware of new management's plans and strategies. Indeed, the primary rationale for a change in corporate ownership and control is the new owners' belief that, by altering the company's business strategy and structure, they can make the company more profitable than it was under old management. In this situation, it seems both unrealistic and perverse to charge the old directors under the distribution statute with knowledge and responsibility for the actions of the new owners. We cannot believe that the legislature intended such a result.
 
 
 32
 We also do not share appellant's view that non-application of the distribution statute would be unfair to creditors. In this case, it is possible that the leveraged acquisition of C-T hastened or caused the company's downfall. On the other hand, C-T's creditors may have actually benefitted from the acquisition. See Baird & Jackson, Fraudulent Conveyance Law and Its Proper Domain, 38 Vand.L.Rev. 829, 853 (1985). The infusion of $4 million in new capital and the presence of a more effective management team may have permitted C-T to survive longer than it otherwise would have and may also have increased the chances that the company would survive over the long-term. In other words, it is impossible to conclude a priori whether a leveraged transaction such as that here on balance benefits or harms creditors of the target corporation. It is possible to say, however, that a creditor cannot avoid bearing the risk that his debtor will make a bad business decision:
 
 
 33
 A creditor who lends a debtor money is taking advantage of the debtor's comparative advantage in using that money productively. A creditor necessarily defers to the debtor's skills in converting the money into other assets. The risk that both the creditor and debtor take is that the use the debtor makes of the money will benefit both parties. The creditor provides the capital, the debtor provides the know-how. The creditor is relying on the debtor's skill and judgment when it makes the loan. Only by giving the debtor discretion can the creditor hope to profit. Giving a debtor discretion, however, necessarily gives him the ability not only to make good decisions, but bad ones as well.
 
 
 34
 Id. at 838. Finally, it is important to recognize that, since LBOs are a well-known element in contemporary business life, creditors are well-positioned to protect themselves. "[T]he debtor-creditor relationship is essentially contractual." Id. at 835. If a creditor fears the prospect of a future leveraged acquisition of its debtor, it can protect itself by bargaining for security interests or protective provisions in its loan agreements that restrict the ability of its debtor to subject itself to a leveraged acquisition without the creditor's approval. See id. at 834-36; see also Kummert, State Statutory Restrictions on Financial Distributions by Corporations to Shareholders: Part I, 55 Wash.L.Rev. 359, 374 n. 63, 395 (1980) (noting "the extensive use by large or longterm creditors of contract provisions that supersede the statutory provisions with far more rigorous restrictions on financial distributions by the corporate debtor").
 
 
 35
 In addition, we note that even if corporate acquisitions are not subject to state distribution restrictions, protection is accorded creditors by the law of creditors' rights, particularly fraudulent conveyance statutes. See generally Sherwin, Creditors' Rights Against Participants in a Leveraged Buyout, 72 Minn.L.Rev. 449, 464-505 (1988) (discussing the application of fraudulent conveyance law to leveraged buyouts); Note, Fraudulent Conveyance Law and Leveraged Buyouts, 87 Colum.L.Rev. 1491 (1987) (same). In contrast to state corporate law, the law of creditors' rights is designed and better equipped to protect creditors in situations such as that presented here. For example, state fraudulent conveyance statutes, see, e.g., Va.Code Ann. §§ 55-80, 55-81 (Michie 1986 & Supp.1991), and federal bankruptcy law, see 11 U.S.C.A. § 548(a) (West 1979 & Supp.1991), enable creditors to recapture transferred funds by attacking the transaction directly. In contrast, distribution restrictions merely impose personal liability on directors, without any provision for a direct recoupment of the distributed assets from the shareholders who received them. See Va.Code Ann. § 13.1-692(A) and (B) (Michie 1989).
 
 
 36
 In attacking the transaction here, appellant fails to acknowledge all the risks inherent in it. Holdings' acquisition of C-T was an uncertain financial proposition for C-T's shareholders as well as its creditors. Although the post-merger corporation failed in this case some eighteen months after the leveraged acquisition, it was anything but clear at the time of the transaction that the corporation would enter bankruptcy. Indeed, C-T's new owners were so confident of its future success that they invested $4 million of their own money in it. Thus, had the domestic shoe market rebounded after the acquisition, the market price of a share in C-T may have risen substantially above the $20 that the pre-merger shareholders received. In that situation, the shareholders--not C-T's creditors--would be complaining today. Both this corporate acquisition and the lending of money to pre-merger C-T involved risk--the same risk that inheres in all legitimate business activity. State distribution statutes simply do not authorize courts to rearrange the losses that inevitably result from risks taken in the hope of gains.
 
 IV.
 
 37
 In sum, we conclude that Holdings' leveraged acquisition of C-T, accomplished in the form of an arm's-length merger between Holdings' subsidiary Acquisition and C-T, did not create a distribution under Virginia law. The judgment of the district court is therefore
 
 
 38
 AFFIRMED.
 
 
 
 [1]
 Section 13.1-690 establishes, inter alia, the following standard of conduct for directors: "A director shall discharge his duties as a director, including his duties as a member of a committee, in accordance with his good faith business judgment of the best interests of the corporation." Va.Code Ann. § 13.1-690(A) (Michie 1989). Because we hold that the merger in this case was not a distribution, we need not consider whether the actions of C-T's pre-merger directors satisfied § 13.1-690
 
 
 [2]
 Our resolution of this case makes it unnecessary to consider whether, if the merger did involve a distribution, the former directors of C-T "vote[d] for or assent[ed] to" it. Va.Code Ann. § 13.1-692(A) (Michie 1989)
 In addition, appellant has not argued before this court, as it did before the district court, see 124 B.R. at 697, that the transaction was "a distribution clothed in the garb of a merger." Id. (citing Wieboldt Stores, Inc. v. Schottenstein, 94 B.R. 488 (N.D.Ill.1988)). Accordingly, we need not address whether §§ 13.1-653 and 13.1-692 apply when a transfer of money or property to shareholders is disguised as a merger in an attempt to avoid the statutory restrictions on distributions.